# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

ARMBRUST INTERNATIONAL, LTD.
AND ERWIN PEARL, INC.
Plaintiffs,

v.

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA and ST. PAUL FIRE AND MARINE INSURANCE COMPANY,
Defendants.

C.A. No. 04-212 ML

## RULE 12.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. Armbrust International, Ltd. ("Armbrust") is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business in Providence, Rhode Island. Armbrust is in the business of manufacturing and distributing precious metal and fashion jewelry, chain and other jewelry products. (Complaint, ¶ 1; admitted in Defendants' Answers).

2. Erwin Pearl, Inc. ("Erwin Pearl") is a corporation organized and existing under the laws of the state of New York with its principal place of business in the City of New York, New York. Erwin Pearl is in the business of designing and distributing jewelry products and collectibles and is a sister corporation of Armbrust. (Complaint, ¶ 2; admitted in Defendants' Answers).

3. Travelers Casualty & Surety Company of America ("Travelers") is a corporation organized and existing under the laws of the state of Connecticut with its principal place of business in Hartford, Connecticut. Travelers is engaged in the business of insurance and, among other things, provides commercial property-casualty insurance and bonds, including Fidelity,

fiduciary, surety and mall insurance. As of the time of the filing of the complaint, Travelers was a subsidiary of the St. Paul Travelers Companies, Inc., the second largest commercial US property-liability insurance company in the United States. (Complaint, ¶ 4; admitted in Defendants' Answers).

4. St. Paul Fire & Marine Insurance Co. ("St. Paul") is a corporation organized and existing under the laws of the state of Minnesota with its principal place of business in St. Paul, Minnesota. St. Paul is engaged in the business of insurance and, among other things, writes commercial property-casualty insurance. As of the time of the filing of the complaint, St. Paul was a subsidiary of the St. Paul Travelers Companies, Inc. and a sister company of Travelers. (Complaint, ¶ 5; admitted in Defendants' Answers).

5. Travelers issued a Commercial Crime Policy, No. 006BY10 3223948BCM, with Armbrust and Erwin Pearl as insureds, with an effective period of October 20, 1999 to October 20, 2000. The policy was procured through an agent of Travelers, Aon Risk Services, Inc. of Rhode Island. Coverage A of this policy was a blanket Employee Dishonesty Coverage with a $500,000 limit of insurance and a $5,000 deductible amount. The policy was generally written on an "occurrence" or "loss sustained" basis, with Travelers agreeing to pay "for loss that you sustain through acts committed or events occurring during the Policy Period." The policy also provided "[w]e will pay only for covered loss discovered no later than one (1) year from the end of the policy period." (Deposition Exhibit 55).[1]

6. Travelers renewed the aforementioned policy for the effective period October 20, 2000 through October 20, 2001. (Deposition Exhibit 56).

[1] Unless otherwise indicated, citations to "Deposition Exhibit" refers to Exhibits marked in the Deposition of Vincent R. Capone, Jr. on May 12, 2005 and June 1, 2005.

7. At all times material to this case, Boylan Capone, Inc. and The Preston Agency, Inc. were authorized agents of both Travelers and St. Paul for both commercial property-casualty insurance and bonds, with the authority to solicit, bind, execute and service policies and endorsements, subject to applicable underwriting standards and rules. (Deposition of Vincent R. Capone, Jr., pp. 234-237). Boylan Capone, Inc. and The Preston Agency, Inc. were independent or non-exclusive agents, and were free to and did act as authorized agents for competing insurance companies. Independent agents are generally compensated for their services by payment by the insurance carrier of an agreed upon commission, typically a percentage of billed premium. (Deposition of Vincent R. Capone, Jr., pp. 237-238).

8. In the fall of 1999, Boylan Capone Inc. and The Preston Insurance Agency, Inc. entered into a long term management/buyout agreement pursuant to which The Preston Insurance Agency, Inc. managed the business of Boylan Capone and eventually purchased its assets. (Deposition of Vincent R. Capone, Jr., pp. 240-242; Deposition Exhibit 54).

9. For some years prior to October 20, 2001, Boylan-Capone/The Preston Insurance Agency, Inc. (hereinafter jointly referred to as "Preston") acted as agent for Travelers in procuring for Armbrust and Erwin Pearl a "Wrap CSL liability" policy, Policy No. 006 LB 103287494 BCM with an effective date of March 12, annually. Prior to 2003, this "Wrap" policy included directors and officers liability, employer practices liability, and fiduciary liability. (Deposition Exhibit 57).

10. In the fall of 2001, Armbrust and Erwin Pearl requested bids from a number of insurance agents, including Preston and Aon, for a comprehensive property casualty insurance, including Employee Theft and Dishonesty coverage, for the policy period beginning October 20, 2001. The request for bids contained specifications including a schedule of property values and locations, and a specification for employee dishonesty and theft coverage with a $500,000 limit

and a $5,000 deductible. The specifications requested the following endorsements for all policies unless otherwise denied:

> <u>Knowledge of Occurrence</u>
>
> It is agreed that the Named Insured will not be charged with knowledge of an occurrence, claim, or suit until such knowledge is received by the Vice President of Finance, Executive VP, and/or VP, Legal and Counsel. This agreement shall be applicable to all policy conditions relating to the insured's duty in the event of occurrence, claim or suit.
>
> <u>Notice of Cancellation, Non-Renewal or Material Modification</u>
>
> It is agreed that the policy provides ninety (90) days advance written notice of cancellation, intention to decline to renew coverage, or material modification in policy terms and conditions.

(Deposition Exhibit 25; Deposition of Vincent R. Capone, Jr., pp. 250-252).

11. Preston submitted the request for bids and specifications to St. Paul who, on October 15, 2001, issued a proposal for coverage. (Deposition Exhibit 58). Based upon St. Paul's quotation, Preston submitted a written proposal to Armbrust and Erwin Pearl, who subsequently accepted the proposal. As a result, St. Paul issued a "premier property protection" policy to Armbrust and Erwin Pearl, Policy No. CK05700250, effective October 20, 2001 through October 20, 2002, which policy insured against a variety of losses. Included among the coverages was an additional benefit of employee dishonesty, with a policy limit of $500,000 and a $5,000 deductible amount. The Employee Theft coverage was written on an occurrence basis. (Complaint, ¶ 9; Deposition of Vincent R. Capone, Jr., p. 247).

12. The Preston Agency understood and believed that the coverage afforded by the St. Paul policy for Employee Theft and Dishonesty was not materially different in any way from the coverage afforded under Travelers' commercial crime policy. (Deposition of Vincent R. Capone, Jr., pp. 243-244; Deposition of Judith Wright, pp. 14-16).

13. Armbrust and Erwin Pearl understood and believed, based upon representations by Preston, that the Employee Theft and Dishonesty coverage afforded by the St. Paul policy was equivalent to that afforded by the Travelers' commercial crime policy. (Deposition of Michael Brozost, pp. 13-15).

14. On August 19, 2002, an underwriter for St. Paul wrote Preston concerning the renewal of Armbrust/Erwin Pearl's coverage which was expiring October 20, 2002. St. Paul requested certain information, including signed statements of values, completed jeweler's block applications for each retail location and alarm certificates, in order to provide a quote for the renewal. No request was made for a completed and signed crime policy application. In addition, St. Paul advised that there would be four changes made effective upon renewal, including a significant increase in premium of at least 30% and the exclusion of precious metals and jewelry from the Fidelity coverage. No change as to policy limits was mentioned. (Deposition Exhibit 26).

15. On September 27, 2002, St. Paul's underwriter, Stanley Wright, met with Vincent Capone of Preston, the producer for the Armbrust/Erwin Pearl account. There was a discussion about the range of premium increases, but no discussion concerning a change in policy limits related to Employee Theft or Dishonesty. (Deposition Exhibit 4; Deposition of Vincent R. Capone, Jr., p. 254).

16. On or about October 7, 2002, St. Paul's underwriter, Stanley Wright, met Judith Wright, an account executive at Preston, concerning the Armbrust/Erwin Pearl renewal. St. Paul insisted that precious metals and jewelry would be excluded from Fidelity/Employee Dishonesty coverage. There was no mention of any change of policy limits. (Deposition Exhibit 5; Deposition of Judith Wright, p. 33).

17. On or about September 19, 2002, St. Paul issued a notice to both Erwin Pearl and Preston pursuant to Rhode Island Department of Business Regulation Insurance Regulation 38, and Rhode Island Gen. Laws § 42-35-3(a). The insured was given notice of a proposed premium increase of 30% or more, and that flood limits on retail locations would be reduced to $1 million. No notice was given with respect to any proposed change to Employee Theft or Dishonesty coverage, either with respect to policy limits or exclusions of precious metals and jewelry. (Deposition Exhibit 60).

18. By October 7, 2002, Preston had not supplied all of the information requested by St. Paul and, by agreement with St. Paul, all coverages for Erwin Pearl and Armbrust were extended for 30 days to November 20, 2002. On that date, Vincent Capone of Preston discussed with Stanley Wright of St. Paul the possibility of including precious metals and jewelry on the Fidelity coverage for a sub-limit to be determined. (Deposition Exhibit 27; Deposition Exhibit 61).

19. On October 9, 2002, Stan Wright confirmed to Judy Wright of Preston his position that precious metals were going to be excluded from Employee Dishonesty coverage. No mention was made as to any change in the overall Employee Dishonesty policy limit of $500,000. There was, however, discussion about a possible sub-limit on precious metals in lieu of an exclusion. (Deposition Exhibit 28).

20. On or about November 15, 2002, Judy Wright of Preston, informed Stanley Wright of St. Paul that: "Based on our prior discussions, please quote this renewal with an Employee Dishonesty sub-limit of $25,000 including the precious metals and stones." Judy Wright intended that this $25,000 sub-limit for precious metals and jewelry would not diminish or affect the overall $500,000 policy limit for Employee Theft and Dishonesty. (Deposition Exhibit 62; Deposition of Judith Wright, pp. 47-48).

21. On or about November 19, 2002, Stanley Wright, on behalf of St. Paul, extended the existing coverage for Armbrust/Erwin Pearl for another week. (Deposition Exhibit 33).

22. On or about November 26, 2002, St. Paul issued a quotation to Preston on the renewal coverage for Armbrust/Erwin Pearl. The quotation included a limit of Employee Dishonesty coverage at $25,000. No mention was made as to any exclusion of precious metals and jewelry from the coverage. The quotation also contained a very significant premium increase, approximating 30%. (Deposition Exhibit 35). According to Judy Wright of Preston, her reaction when she saw this quotation was "shock, disbelief, surprise is probably the best word." This was the first time that she had any indication that St. Paul was not contemplating renewing the Employee Dishonesty coverage with a $500,000 limit. (Deposition of Judith Wright, p. 53).

23. On November 27, 2002, Preston presented an insurance proposal to Armbrust and Erwin Pearl. The terms of coverage coincided with the quotation issued the prior day by St. Paul. (Deposition Exhibit 6). Michael Brozost, Vice President and Legal Counsel of Erwin Pearl, made it clear that $500,000 worth of overall Employee Dishonesty and Theft coverage was necessary, and Brozost was told by Preston that they would negotiate with St. Paul. (Deposition of Michael Brozost, pp. 45-46). On November 30, 2002, Judy Wright of Preston communicated with Vincent Capone of Preston and advised that she would ask Stan Wright of St. Paul if they would write a higher Employee Dishonesty limit for other than precious metals. (Deposition Exhibit 36).

24. After the quotation was received, Preston and St. Paul negotiated over the terms of renewal, with the negotiations focusing primarily upon trying to reduce premiums. On or about December 10, 2002, St. Paul reduced the total premium quotation by approximately $5,000 and coverage was bound as of the original date of October 20, 2002. (Deposition Exhibit

64). On or about December 13, 2002, St. Paul again reduced the quoted premium. (Deposition Exhibit 65).

25. On December 16, 2002, Judy Wright of Preston asked Stanley Wright of St. Paul to increase the Employee Theft and Dishonesty coverage to $500,000 as expiring, with the precious metals at a $25,000 sub-limit. (Deposition Exhibit 38).

26. On or about December 26, 2002, St. Paul processed and printed a renewal of Policy No. CK05700250. (Deposition Exhibits 66-69).

27. Among the policy forms included in Policy No. CK 05700250 was Endorsement 40701, revised 9-96, setting forth general rules applicable to the entire policy. The section on policy changes reads as follows:

> This policy contains all the agreements between you and us concerning this insurance. The first named insured is authorized to make changes in this policy with our consent. This policy can only be changed by a written form included as part of the policy. This form must be signed by one of our authorized representatives.

(Deposition Exhibit 68).

28. Also included as part of Policy No. CK05700250, processed on December 26, 2002, was Form 0173, revised 7-01, setting forth the additional benefits coverage. The additional benefit limit for Employee Theft was stated as $500,000. (Deposition Exhibit 69).

29. Included as part of Policy No. CK05700250 is Policy Form F0150, revised 7-01. Under Employee Theft, the policy reads as follows:

> We will pay for loss or damage to money, securities or other property resulting directly from theft by any of your employees. This can be money, securities or other property you own or that you are holding, whether or not you are liable for its loss. But we won't pay more that the additional benefit limit for Employee Theft shown in the Coverage Summary.

(Documents produced by Defendant St. Paul, Bates Nos. SP0983 and SP0989, attached as <u>Exhibit A</u>).

30. Preston earned and was paid a commission of 15% of the policy as billed by St. Paul. (Deposition Exhibit 70).

31. On January 6, 2003, Stanley Wright of St. Paul communicated with Judy Wright of Preston and stated:

> As far as the Crime goes we can quote the $500,000 with a limitation on precious metals of $25,000. To quote I would first need to receive a completed Crime Application.

(Deposition Exhibit 39).

32. On January 24, 2003, St. Paul processed Endorsement 2 to Policy CK05700250. The endorsement changed the Employee Theft coverage by specifically excluding precious metals, precious or semi-precious stone or pearls. The endorsement as issued was not signed by an authorized representative, nor was prior written notice provided the insured pursuant to Rhode Island Department of Business Regulation Insurance Regulation 38. (Deposition Exhibit 71).

33. On February 4, 2003, Vincent Capone of Preston, communicated with Judy Wright of Preston and asked:

> Did Stan's quote spell out that the $25,000 sub-limit was just that, a sub-limit or only $25,000 in coverage only. If that is the case we need to address this. One thought – because we have a Wrap with Travelers we can include Dishonesty in the Wrap with EPLI and Fiduciary.

(Deposition Exhibit 9).

34. On or about February 6, 2003, Preston sent a completed "Crime Section" application to Travelers and requested a quotation for Employee Dishonesty blanket coverage with a $500,000 limit. Travelers was asked to quote this coverage along with the renewal quote for the Wrap policy. (Deposition Exhibit 72).

35. On February 7, 2003, Judy Wright of Preston wrote Michael Brozost of Armbrust/Erwin Pearl and informed him:

> I asked St. Paul to increase the limit on the Employee Dishonesty coverage. The maximum he can do this year is $250,000. I faxed him the application and asked if he could please get me an okay today. I am still waiting but with the snow storm we are having, Mike, I can't promise I will have this answer today. Businesses are starting to close early. I'll be here a while, probably until 5:00, so if he sends me an answer, I'll get it to you. We will still pursue the excess limits from $250,000 to $500,000 from Travelers.

(Deposition Exhibit 40).

36. On February 7, 2003, Judy Wright of Preston communicated with Stanley Wright of St. Paul asking if he could get her an okay on the Employee Dishonesty coverage today. On February 10, 2003, Stanley Wright responded indicating he had not received the application. Judy Wright resent the application. (Deposition Exhibit 41).

37. Michael Brozost was told by the agency that although St. Paul now did not wish to write more than $250,000 of Employee Dishonesty, that Armbrust/Erwin Pearl was covered in the full amount in the interim until replacement coverage could be replaced. (Deposition of Michael Brozost, p. 45). On February 10, 2003, Mike Brozost had a telephone conversation with Judy Wright of Preston in which he expressed his anxiety over the coverage issue. (Deposition Exhibit 42). They spoke again on February 12 and Judy Wright told Michael Brozost that she was still waiting on Stanley Wright and would follow up again. (Deposition Exhibit 43).

38. On February 12, 2003, Stanley Wright indicated he still had not yet received the application and, for a third time, Judy Wright resent it. (Deposition of Judith Wright, pp. 81-82; Deposition Exhibit 73).

39. On February 13, 2003, Stanley Wright, on behalf of St. Paul, quoted Crime coverage for Erwin Pearl with Employee Dishonesty at a $250,000 limit, a $2,500 deductible, and a $25,000 sub-limit for precious metals/jewelry. The quoted premium was $13,856. Stanley Wright also advised that St. Paul could not back-date more than 30 days with a "no loss" letter. (Deposition Exhibit 44).

40. In a separate communication that day, Stanley Wright confirmed that the premium quoted was an annual premium, not the price to add as of February 13. (Deposition Exhibit 46).

41. On February 13, 2003, Judy Wright on behalf of Preston, communicated St. Paul's quotation for Employee Dishonesty coverage. She also stated:

> And now that I know I have the base crime policy in place, I'll have Melissa go after the second layer of $250,000 for you on the Employee Dishonesty.

(Deposition Exhibit 47).

42. On February 18, 2003, Daniel Boermester of Travelers communicated with Preston and indicated that they would quote $500,000 worth of Employee Dishonesty coverage as part of the Wrap Policy. (Deposition Exhibit 10).

43. On February 20, 2003, Travelers quoted a renewal of the Wrap Policy No. 103287494 including Employee Dishonesty coverage with a single loss limit of $500,000 and a retention of $25,000. The annual premium for the Wrap Policy renewal was quoted at $11,860, with a 12.5% commission to be paid Preston by Travelers. (Deposition Exhibit 13).

44. Preston communicated the quotation from Travelers to Michael Brozost at Erwin Pearl. Brozost was told his options of reducing Employee Dishonesty coverage with St. Paul to $250,000, versus reducing Employee Dishonesty coverage with St. Paul to $25,000 and placing the excess with Travelers as part of the Wrap Policy. The latter option was significantly less expensive, and Brozost was not informed of any material difference in the coverages. To the contrary, both Judy Wright and Vincent Capone of Preston believed and understood that the coverages were essential equivalent, written on an occurrence basis. (Deposition of Vincent R. Capone, Jr., p. 303; Deposition of Judith Wright, pp. 87-92).

45. On March 4, 2003, Travelers agreed to bind $500,000 of Employee Dishonesty coverage effective February 25, 2003, until March 12, 2003, at no charge. March 12, 2003 was

the effective date of the renewal of the Wrap Policy. On the same date, Preston ordered the renewal effective March 12, 2003 including the $500,000 Employee Dishonesty limit. (Deposition Exhibit 11).

46. On March 6, 2003, Preston communicated with St. Paul as follows:

> Please do not issue an endorsement increasing the crime up to the $500,000. We were able to add the excess coverage to another policy for less premium. C'est la vie. Thanks anyway.

(Deposition Exhibit 48).

47. On March 6, 2003, Michael Brozost, on behalf of Armbrust and Erwin Pearl, signed a premium summary acknowledging the premiums and coverages purchased effective October 20, 2002. The summary showed $25,000 of Employee Dishonesty coverage, with "excess limits added to Travelers' policy as of 2/25/03. (Deposition Exhibit 49).

48. The Employee Dishonesty coverage obtained from Travelers under Policy No. 103287494, with a $500,000 policy limit and $25,000 deductible, in Insuring Agreement A, defined employee dishonesty as "direct loss of, and direct loss from damage to, money, securities and other property resulting from Employee Theft." (Deposition Exhibit 74; Policy produced by Defendant Travelers, attached as Exhibit B, at Bates No. D00007).

49. Section IV of Travelers' Policy No. 103287494 provides as follows:

> Subject to Section V.B. below, this Coverage Part applies to loss which occurs during the Policy Period. Losses covered under this Coverage Part only if discovered no later than 120 days following termination or cancellation of the Insuring Agreement or termination of this Coverage Part as to an Insured, except for loss under Insuring Agreement G, which provides for an automatic 12-month discovery period. At any time prior to the termination of this Coverage Part in its entirety, the Insured may give written notice to the Company requesting an extension of the discovery period for loss under this Coverage Part to 12 months and shall pay an additional premium.

(Policy produced by Defendant Travelers, attached as Exhibit B, at Bates No. D000012).

50. In addition, Section V.B. of the aforementioned policy, entitled Loss Sustained During Prior Insurance, provides:

> 1. If the Insured or a predecessor in interest sustained loss during the period of any prior insurance that it or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, the Company will pay for it under this Coverage Part, provided:
>
> > a. This Coverage Part became effective at the time of cancellation or termination of the prior insurance; and
> >
> > b. The loss would have been covered by this Coverage Part had it been in effect when the acts or events causing the loss were committed or occurred.

(Policy produced by Defendant Travelers, attached as Exhibit B, at Bates No. D00013).

51. On April 8, 2003, Judy Wright of Preston wrote to Stanley Wright of St. Paul. Judy Wright communicated that she had reviewed Erwin Pearl's Policy CK05700250 and had a number of questions. Among those were the following:

> 6. Your schedule of additional benefits shows Employee Theft at $500,000 limit. You want to fix that?
>
> 7. The computer limit you quoted was $500,000, but that same schedule of additional benefits only shows $25,000. Please fix, thanks.
>
> 8. The transit limit you quoted $20,000/ $40,000 is not how the policy got issued. We never changed this last year, and as long as the way the policy is issued is at least as good as if not better than your quoted terms, no need to change this year.
>
> 9. I thought we agreed we would provide precious metals coverage in the $25,000 limit for Employee Theft. Don't see that your quote excluded it? Help!

(Deposition Exhibit 75). In response, Stanley Wright, on behalf of St. Paul, agreed to Items 6 through 9. *Id.*

52. On or about April 18, 2003, St. Paul issued Endorsement 003, with a effective date of February 10, 2003, reducing the additional benefit limit of Employee Theft to $25,000.

Changes were also made to the limit for computer coverage and for property in transit in accordance with Judy Wright's April 8, 2003 letter. The endorsement was not signed by an authorized representative. (Deposition Exhibit 76).

53. Also, on or about April 18, 2003, St. Paul issued endorsements modifying the statement of values of various properties as agreed upon with the insured and issued a return of premium in the amount of $23,616. (Document produced by Defendant St. Paul, Bates No. SP 0077, attached as Exhibit C).

54. On May 1, 2003, Judy Wright of Preston had a telephone conversation with Stanley Wright of St. Paul pursuant to which Stanley Wright agreed that the Employee Dishonesty coverage in the amount of $25,000 would include precious metals and jewelry. Notwithstanding this agreement, St. Paul never issued an endorsement changing Endorsement No. 002, which excluded precious metals and jewelry from Employee Theft coverage. (Deposition Exhibit 77).

55. In or about April, 2000, Armbrust hired Michelle Kyles Gardner as its Human Resources Manager. Unbeknownst to Armbrust or Erwin Pearl, beginning in May, 2000, Kyles Gardner initiated a scheme to embezzle company funds by preparing improper payroll checks such as, but not limited to, checks for employees who: (1) were terminated from employment; (2) were on temporary leave of absence; or (3) were issued unauthorized vacation pay. Upon information and belief, Ms. Kyles Gardner would then fraudulently endorse the employee's name on the payroll check and either deposit the check into an account at Pawtucket Credit Union or cash the check. (Complaint, ¶ 15; Deposition of Thomas J. Baker, pp. 6-11).

56. Despite having reasonable controls in place, including annual audits by an independent auditing firm, Armbrust did not discover the loss until May, 2003. Ms. Gardner's employment was terminated on May 8, 2003 and the police were notified. Ms. Gardner has been

charged with a felony, which case is still pending. *See State of Rhode Island v. Michelle Kyles Gardner*, Case No. P2-2004-0404A. (Complaint, ¶ 16; Deposition of Thomas J. Baker, pp. 8-13).

57. Upon the discovery of the loss, both Travelers and St. Paul were notified of the loss on or about May 29, 2003. Formal proofs of loss were filed with Travelers and St. Paul on or about September 9, 2003. The total amount of the claim loss, as of that date, was $323,203.67. (Complaint, ¶ 17).

58. On or about September 11, 2003, Robert S. Quigley, Vice President of Preston, wrote to St. Paul and, among other things, stated:

> You were unaware that the Travelers' Policy which we purchased carried a $25,000 deductible (done so that the Travelers' Policy would be excess over your contract (sorry)) and as such the other insurance provisions do not come into play as there is no other insurance at that level. I assume you will proceed with the thought that you are the primary carrier and Travelers is excess and will move the claim in that direction.

(Deposition Exhibit 80).

59. On or about March 1, 2004, St. Paul issued Endorsement No. 006 to Policy CK05700250 purporting to change the effective date of Endorsement No. 003 (which purported to change the policy limit applicable to Employee Theft and Dishonesty to $25,000 from $500,000) from February 10, 2003 to October 20, 2002. St. Paul also purported to reduce the additional benefit for computer coverage (from $500,000 to $25,000) and change the limit on property in transit, all without any return of premium. (Deposition Exhibit 83).

60. On or about March 24, 2004, St. Paul responded to the claim, taking the position that there was coverage for the claim under the policy which was in effect from October 20, 2002 to October 20, 2003 but that there was no coverage under the policy which was in effect the prior

year. St. Paul proffered their full policy limits of $25,000 under the 2002-2003 policy based upon the following analysis.

> In Rhode Island a claim for property damage is covered under the policy that is in effect when the damage manifests itself, is discovered or, in the exercise of reasonable diligence is discoverable. Unlike the typical property insurance situation, where the discovery and manifestation of the damage coincides with the time the damage occurred, the theft by Ms. Gardner was undetected over the course of three years during which it took place. The theft, which began before the St. Paul first provided coverage to Erwin Pearl, was discovered in May of 2003 and, therefore, there is coverage for the loss only under the St. Paul policy that was in effect in May 2003.

(Exhibit A to Plaintiffs' Complaint).

61. In contrast to St. Paul, Travelers denied coverage in its entirety on or about March 23, 2004. Travelers stated:

> The Fidelity coverage part of the 2003 – 2004 Travelers' Policy includes Employee Dishonesty coverage. Pursuant to the discovery section of the policy, however, the Employee Dishonesty coverage only applies 'to loss which occurs during the policy period.'

Since the amount actually embezzled by Ms. Kyles-Gardner during the year 2003-2004 policy period was less than $25,000, Travelers claimed it had no liability. Travelers also denied coverage under Section V.B., the Loss Sustained During Prior Insurance Provision, on the grounds that the loss was not discovered during the time required by the earlier policies. (Exhibit B to Plaintiffs' Complaint).

62. On or about May 14, 2004, Travelers reiterated it position and reaffirmed its denial of coverage in its entirety. (Complaint, ¶ 21).

ARMBRUST INTERNATIONAL, LTD.
AND ERWIN PEARL, INC.

By Their Attorneys,

PARTRIDGE SNOW & HAHN LLP

Steven E. Snow (#1774)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: August 12, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing RULE 12.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE was mailed, postage prepaid, on this 12th day of August, 2005 to:

Anthony R. Zelle, Esq.
Denner O'Malley, LLP
Four Longfellow Place
35th Floor
Boston, MA 02114

John J. Flanagan, Esq.
2348 Post Road
Warwick, RI 02886

Stephen H. Burke, Esq.
Ratcliffe, Burke, Harten & Ellis LLP
1600 Financial Plaza
Providence, RI 02903

Robert J. Maselek, Jr., Esq.
Mark E. Cohen, Esq.
McCormack & Epstein
One International Place
7th Floor
Boston, MA 02110

807350_1/3119-3

1:03

# THE ST. PAUL PREMIER PROPERTY PROTECTION

TheStPaul

We've designed this agreement to protect against a variety of property losses. There are limitations and they are explained later in this agreement.

**Table of Contents**


| | Page |
|---|---|
| **What This Agreement Covers** | **2** |
| Covered Causes Of Loss | 2 |
| Property Covered | 2 |
| Building Coverage | 2 |
| Business Personal Property Coverage | 2 |
| Other people's property. | 2 |
| Improvements coverage. | 3 |
| Burglary damage to buildings. | 3 |
| Property Not Covered At All | 3 |
| **Additional Coverages** | **3** |
| Debris Removal Coverage | 3 |
| Preservation Of Property Coverage | 4 |
| Undamaged Portion Of The Building | 4 |
| **Where We'll Cover** | **4** |
| **Additional Benefits** | **4** |
| Accounts Receivable | 5 |
| Catastrophe Allowance | 5 |
| Computers | 5 |
| World wide coverage extension. | 6 |
| Deferred Payments | 6 |
| Demolition And Increased Cost Of Construction | 6 |
| Depositors Forgery | 6 |
| Employee Theft | 7 |
| Endangered Property | 7 |
| Extra Expense | 7 |
| Fine Arts | 7 |
| Fire Department Service Charge | 7 |
| Fire Protective Equipment | 8 |
| Inventory And Appraisals | 8 |
| Lost Key | 8 |
| Money And Securities | 8 |
| Money Orders And Counterfeit Currency | 8 |
| Newly Acquired Property | 8 |
| Off Premises Utility Failure | 9 |
| Outdoor Property | 9 |
| Personal Belongings | 9 |
| World wide coverage extension. | 9 |
| Pollution Cleanup And Removal | 9 |
| Property In Transit | 10 |
| World wide coverage extension. | 10 |
| Radioactive Contamination | 10 |
| Random Attack - Hacking Event Or Computer Virus | 10 |
| Rewards | 11 |
| Unscheduled Locations | 11 |
| Valuable Records Research | 11 |
| Voluntary Surrender | 11 |
| **Exclusions - Losses We Won't Cover** | **11** |
| Acts or decisions. | 11 |
| Boilers. | 12 |
| Collapse. | 12 |
| Contamination. | 12 |
| Defects or errors. | 12 |
| Disappearance. | 12 |
| Dishonesty. | 12 |
| Earth movement. | 13 |
| Electrical damage. | 13 |
| Flood. | 13 |
| Governmental action. | 13 |
| Indirect loss. | 14 |
| Mechanical breakdown. | 14 |
| Nuclear activity. | 14 |
| Ordinances, regulations, or laws. | 14 |
| Planning, design, materials, maintenance. | 14 |
| Pollution. | 14 |
| Random attack - hacking event or computer virus. | 15 |
| Settling, smog. | 15 |
| Utility failure. | 15 |
| Voluntary surrender. | 15 |
| War. | 15 |
| Wear, tear, deterioration, animals. | 16 |
| **Exclusion Exceptions** | **16** |
| **Rules For Loss Adjustment** | **16** |
| How Your Property Is Valued | 16 |
| Property insured on an actual cash value basis. | 16 |
| Property insured on a replacement cost basis. | 16 |
| Special rules for building ordinances or laws. | 17 |
| Rules for valuing special property. | 17 |
| Expenses we'll cover for waterborne shipments. | 19 |
| Deductible | 19 |
| Coinsurance Rule | 19 |
| What's the minimum amount? | 19 |
| How the rule works. | 20 |
| Agreed Amount Option | 20 |
| Other Insurance | 20 |
| Adjusting Losses | 21 |
| Who We'll Pay For Loss To Business Personal Property | 21 |
| If Your Building Is Mortgaged | 21 |
| Rights and duties of mortgageholders. | 21 |
| Transfer of mortgageholder's right to us. | 21 |


** This is not a certified copy of any policy form. * Actual policy provisions may differ. **

F0150 Rev. 7-01 Printed in U.S.A. Insuring Agreement

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
©St.Paul Fire and Marine Insurance Co. 2001 All Rights Reserved



SP0983

you have our written consent to defend against the suit.

But we won't pay more than the additional benefit limit for depositors forgery shown in the Coverage Summary. This is the most we'll pay for loss including defense costs in any one event regardless of how many protected persons, property owners, covered items, or financial interests are involved.

*Event* means an act or series of related acts involving one or more persons.

*Protected persons* are people and organizations protected under this additional benefit.

**Employee Theft**

We'll pay for loss or damage to money, securities or other property resulting directly from theft by any of your employees. This can be money, securities or other property you own or that you're holding, whether or not you're liable for its loss. But we won't pay more than the additional benefit limit for employee theft shown in the Coverage Summary.

This protection applies only when there is evidence that the employee meant to cause you a loss. The evidence must also show that the employee intended that he or she or another person or organization would get some unearned financial benefit.

Financial benefit doesn't include salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment.

We won't consider any of the following to be an employee:

- agent, broker, factor, commissioner, merchant, consignee, independent contractor, or representative of the same general character; or
- director or trustee, except while performing acts or duties within the scope of the usual duties of an employee.

**Endangered Property**

We'll pay for reasonable and necessary expenses you incur for the temporary protection and preservation of covered property actually damaged or threatened with imminent loss or damage from a covered cause of loss.

But we won't pay more than the additional benefit limit for endangered property shown in the Coverage Summary.

**Extra Expense**

We'll pay to help you maintain normal business operations following direct loss or damage by a covered cause of loss to covered property. We'll pay extra expenses that are over and above your normal operating costs and that are directly related to your covered loss.

But we won't pay more than the additional benefit limit for extra expense shown in the Coverage Summary.

We'll cover you from the date of the damage for as long as it should reasonably take to rebuild, repair, or replace your damaged covered property regardless of when this agreement ends.

We won't pay for loss of income. Nor will we pay for repairing, replacing, or restoring covered property or necessary papers, computer software, and records under this benefit.

**Fine Arts**

We'll pay for direct physical loss or damage by a covered cause of loss to your fine arts or the fine arts of others while in your care, custody, or control while in or on a building at a covered location or within 1,000 feet of it.

But we won't pay more than the additional benefit limit for fine arts shown in the Coverage Summary.

*Fine arts* mean antiques and objects of art of every nature and description.

**Fire Department Service Charge**

SP0989

When the fire department is called to protect your covered property from a covered cause of loss, we'll pay for fire department service charges you've agreed to

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *


Includes copyrighted material of Insurance Services Office, Inc. with its permission.
©St.Paul Fire and Marine Insurance Co. 2001 All Rights Reserved

TravelersInsurance
A member of citigroup

The Wrap℠

## Fidelity Coverage Part

### I. INSURING AGREEMENTS.

Subject to the Wrap Declarations, the Fidelity Coverage Part Declarations, the Common Terms and Conditions, this **Coverage Part** and other terms hereof, the Company agrees to indemnify the **Insured** for:

**A. EMPLOYEE DISHONESTY**

Direct loss of, and direct loss from damage to, **Money**, **Securities** and other property resulting from **Employee Theft**.

**B. FORGERY OR ALTERATION**

Loss resulting directly from **Forgery** or alteration of, on or in **Covered Instruments** that are:

1. made or drawn by or drawn upon the **Insured**; or
2. made or drawn by one acting as the **Insured's** agent;

or that are purported to have been so made or drawn. Mechanically reproduced facsimile signatures are the same as handwritten signatures.

The Company will include the proprietor, partners and officers of the **Insured** as additional **Insureds** under this Insuring Agreement, but only for loss involving **Covered Instruments** of those persons' personal accounts and subject to the Limit of Liability and Retention shown in this **Coverage Part** Declarations. Coverage provided for personal accounts is part of, and not in addition to, the Limit of Liability under Insuring Agreement B.

The Company will also pay reasonable legal expenses that the **Insured** incurs if it is sued for refusing to pay any of the **Covered Instruments** under Insuring Agreement B on the basis that such instrument has been forged or altered and the **Insured** has the Company's written consent to defend against the suit. Payment of reasonable legal expenses is in addition to the applicable Limit of Liability under Insuring Agreement B.

**C. ON PREMISES**

Loss of **Money** and **Securities** resulting directly from the actual destruction, disappearance or **Theft** within the **Premises** or within any **Banking Premises** or similar recognized places of safe deposit.

Coverage under this Insuring Agreement shall also include:

1. loss of, or loss from damage to other property within the **Premises** resulting directly from an actual or attempted **Robbery** or **Safe Burglary**;

2. loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft**, if the **Insured** is the owner of the **Premises** or is liable for damage to it;

3. loss of, or loss from damage to a locked safe, vault, cash box, cash register or cash drawer within the **Premises** resulting directly from an actual or attempted **Theft** of, or unlawful entry into those containers.

D00007

D. **IN TRANSIT**

**Loss of Money and Securities resulting directly from the actual destruction, disappearance or Theft while outside the Premises in the care and custody of a Messenger or armored motor vehicle company or while temporarily within the living quarters of the Messenger. Coverage under this Insuring Agreement shall also include loss of, or loss from damage to the Insured's other property by actual or attempted:**

1. **Robbery** while outside the **Premises** in the care and custody of a **Messenger** or armored motor vehicle company; and

2. **Theft** while temporarily within the living quarters of a **Messenger.**

E. **MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY**

Loss resulting directly from:

1. the acceptance in good faith, in exchange for merchandise, **Money** or services, of any post office or express money order issued or purported to have been issued by any post office, if such money order is not paid upon presentation; and

2. the acceptance in good faith, in the regular course of business, of counterfeit paper currency of the United States of America, Canada or any other country in which the **Insured** maintains a physical premises.

F. **COMPUTER FRAUD AND FUNDS TRANSFER FRAUD**

Loss of, or loss from damage to:

1. **Money**, **Securities** and other property resulting directly from **Computer Fraud**, and

2. **Money** and **Securities** contained in a **Transfer Account** on deposit at a **Financial Institution** resulting directly from **Funds Transfer Fraud**.

G. **ERISA FIDELITY**

Direct loss of, and direct loss from damage to, **Money**, **Securities**, and other property of any **Pension Plan** or **Welfare Plan** sponsored exclusively by the **Insured Organization** resulting from **Employee Theft**.

Other than the Single Loss Limit of Liability for Insuring Agreement G set forth in ITEM 2.B. of the Declarations for this **Coverage Part**, coverage under Insuring Agreement G shall not be subject to any other Limit(s) of Liability in this **Policy**, including but not limited to the Limit(s) of Liability set forth in the Wrap Declarations or ITEM 2.A. of the Declarations for this **Coverage Part**.

II. **DEFINITIONS.**

Whenever appearing in this **Coverage Part**, words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A. "**Banking Premises**" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

B. "**Computer Fraud**" means **Theft** of property following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises** to a person (other than a **Messenger**) outside those **Premises** or to a place outside those **Premises**.

D00008

C. **"Covered Instruments" means checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in Money.**

D. **"Employee Theft" means the unlawful taking of Money, Securities and other property to the deprivation of an Insured by an Employee, whether identified or not, acting alone or in collusion with others.**

E. **"Financial Institution"** means:

1. a banking, savings, or thrift institution, or

2. a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution where the **Insured** maintains a **Transfer Account**.

F. **"Forgery"** means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose.

G. **"Funds Transfer Fraud"** means:

1. electronic, telegraphic, cable, teletype or telephone instructions fraudulently transmitted to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** which instructions purport to have been transmitted by the **Insured** but were in fact fraudulently transmitted by someone other than the **Insured** without its knowledge or consent; or

2. fraudulent written instructions (other than those covered under Insuring Agreement B) issued to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions which instructions purport to have been issued by the **Insured** but were in fact fraudulently issued, forged or altered by someone other than the **Insured** without its knowledge or consent.

H. **"Insured"** means the **Insured Organization** and, with respect to Insuring Agreement G only, any **Welfare Plan** or **Pension Plan** sponsored exclusively by the **Insured Organization**.

I. **"Messenger"** means the **Insured** and any of its partners, **Officer-shareholders** or **Employees** who are duly authorized by the **Insured** to have care and custody of the property outside the **Premises**.

J. **"Money"** means:

1. currency, coins and bank notes in current use and having a face value; and

2. travelers checks, register checks and money orders held for sale to the public.

K. **"Officer-shareholder"** means any officer who has a twenty-five percent (25%) or greater ownership interest in any one or more of those entities named as **Insureds**.

L. **"Premises"** means the interior of that portion of any building the **Insured** occupies in conducting its business.

M. **"Robbery"** means the taking of property from the care and custody of the **Insured**, its partners or any other person (except any person acting as a **Watchperson** or janitor) by one who has:

1. caused or threatened to cause that person bodily harm; or

2. committed an unlawful act witnessed by that person.

D00009

**N. "Safe Burglary" means the taking of:**

1. **property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or**

2. **a safe or vault from inside the Premises.**

O. **"Securities"** means negotiable and non-negotiable instruments or contracts representing either **Money** or other property and includes:

1. tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2. evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**, but does not include **Money**.

P. **"Theft"** means any act of stealing.

Q. **"Transfer Account"** means an account maintained by the **Insured** at a **Financial Institution** from which the **Insured** can initiate the transfer, payment or delivery of **Money** or **Securities**:

1. by means of electronic, telegraphic, cable, teletype or telephone instructions communicated directly or through an electronic funds transfer system, or

2. by means of written instructions (other than those covered under Insuring Agreement B) establishing the conditions under which such transfers are to be initiated by such **Financial Institution** through an electronic funds transfer system.

R. **"Watchperson"** means any person retained by the **Insured** specifically to have care and custody of property inside the **Premises** and who has no other duties.

## III. EXCLUSIONS.

A. This **Coverage Part** shall not apply to loss:

1. resulting from any dishonest or criminal act committed by the **Insured**, its partners or **Officer-Shareholders** whether acting alone or in collusion with other persons;

2. resulting from seizure or destruction of property by order of any governmental authority;

3. that is an indirect result of any act or event covered by this insurance, including but not limited to loss resulting from:

a. the **Insured's** inability to realize income that it would have realized had there been no loss of, or loss from damage to property that would be covered under this **Coverage Part**;

b. payment of damages of any type for which the **Insured** is legally liable; provided, however, that the Company will pay compensatory damages arising directly from a covered loss under this **Coverage Part**; or

c. payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Coverage Part**; provided, however, the Company will reimburse the **Insured** for reasonable fees and expenses up to $5,000 (Five Thousand Dollars) incurred by the **Insured**, with the Company's prior consent, for an independent outside accounting service used to determine the amount of loss covered under this **Coverage Part**, provided that the amount of direct covered loss exceeds the Retention amount for the applicable Insuring Agreement. Such reimbursement is part of, and not in addition to, the Limit of Liability for the applicable Insuring Agreement;

D00010

**4. due to expenses related to any legal action, except as may be covered under Insuring Agreement B;**

**5. based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, nuclear waste, radioactive contamination, radioactive substance, or the hazardous properties of nuclear material or of any nuclear assembly or nuclear component thereof;**

**6. resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident;**

7. or that part of any loss, the proof of which as to its existence or amount is dependent upon:

a. an inventory computation; or

b. a profit and loss computation;

provided, however, that, where the **Insured** establishes wholly apart from such computations that it has sustained a loss covered under Insuring Agreements A or F, it may offer its inventory records and an actual physical count of inventory in support of other evidences as to the amount of loss claimed;

8. sustained by the **Insured** unless discovered within 120 days following termination or cancellation of the Insuring Agreement or termination of this **Coverage Part** as to such **Insured**;

9. of trade secrets, confidential processing methods, confidential information or intangible property of any kind;

10. resulting directly or indirectly from trading whether in the name of the **Insured** and whether or not in a genuine or fictitious account; and

11. based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged **Pollution**, including but not limited to any such loss alleging damage to the **Insured Organization** or to its shareholders or creditors.

B. Insuring Agreement A does not apply to loss caused by an **Employee** or an **Employee** of a predecessor in interest of the **Insured**, for whom similar prior insurance has been canceled and not reinstated since the last such cancellation unless the amount of such loss is $1,000 or less.

C. Insuring Agreement B does not apply to loss resulting from any dishonest or criminal acts committed by any of the **Insured's Employees**, directors or trustees whether acting alone or in collusion with other persons or while performing services for the **Insured** or otherwise.

D. Insuring Agreements C and D do not apply to loss:

1. of property after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises** on the basis of unauthorized instructions or as a result of a threat to do bodily harm to any person or damage to any property. But, this exclusion does not apply to loss of property while outside the **Premises** or **Banking Premises** in the care and custody of a **Messenger** if the **Insured**:

a. had no knowledge of any threat at the time the conveyance began; or

b. had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

2. resulting from any dishonest or criminal acts committed by any of the **Insured's Employees**, directors, trustees or authorized representatives whether acting alone or in collusion with other persons or while performing services for the **Insured** or otherwise.

D00011

3. resulting from accounting or arithmetical errors or omissions.

**4. resulting from the giving or surrendering of property in any exchange or purchase.**

**5. from damage to the Premises or other property resulting from fire, however caused; except loss from damage to a safe or vault arising from a covered peril.**

6. of property contained in any money operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device;

7. from damage to the **Premises** or its exterior or to containers of covered property by vandalism or malicious mischief.

8. resulting from the **Insured**, or anyone acting on its express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property;

9. of, or loss from damage to motor vehicles, trailers or semi-trailers or equipment and accessories to them.

10. of, or loss from damage to precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles.

11. in excess of $5,000 (Five Thousand Dollars) for loss of and loss from damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them; and

12. of, or loss from damage to **Money**, **Securities** or other property while in the care and custody of an armored motor vehicle company. But, the Company will pay only for the amount of loss the **Insured** cannot recover:

a. under your contract with the armored motor vehicle company; and

b. from any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

E. Insuring Agreement F does not apply to loss:

1. resulting from any dishonest or criminal acts committed by any of the **Insured's Employees**, directors, trustees or authorized representatives whether acting alone or in collusion with other persons or while performing services for you or otherwise; and

2. in excess of $5,000 (Five Thousand Dollars) for loss of, or loss from damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

## IV. DISCOVERY.

Subject to Section V.B. below, this **Coverage Part** applies to loss which occurs during the **Policy Period**. Loss is covered under this **Coverage Part** only if discovered no later than 120 days following termination or cancellation of the Insuring Agreement or termination of this **Coverage Part** as to an **Insured**, except for loss under Insuring Agreement G., which provides for an automatic twelve-month discovery period. At any time prior to the termination of this **Coverage Part** in its entirety, the **Insured** may give written notice to the Company requesting an extension of the discovery period for loss under this **Coverage Part** to twelve months and shall pay an additional premium.

## V. CONDITIONS.

### A. JOINT INSURED.

1. If any **Insured** or partner or officer of that **Insured** has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every **Insured**.

2. An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

D00012

3. **The Company will not pay more for loss sustained by more than one Insured than the amount it would pay if all the loss had been sustained by one Insured.**

**B. LOSS SUSTAINED DURING PRIOR INSURANCE.**

1. If the **Insured** or a predecessor in interest sustained loss during the period of any prior insurance that it or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, the Company will pay for it under this **Coverage Part**, provided:

a. this **Coverage Part** became effective at the time of cancellation or termination of the prior insurance; and

b. the loss would have been covered by this **Coverage Part** had it been in effect when the acts or events causing the loss were committed or occurred.

2. The insurance under this agreement is part of, and not in addition to, the Limits of Liability applicable to this **Coverage Part** and is limited to the lesser of the amount recoverable under:

a. this **Coverage Part** as of its effective date; or

b. the prior insurance had it remained in effect.

In the event that a loss is covered by this **Coverage Part** and a preceding policy, it is agreed that the Insuring Agreement Retention for this **Coverage Part** shall be reduced by the applicable Retention of the preceding policy.

**C. LOSS COVERED UNDER THIS INSURANCE AND PRIOR INSURANCE ISSUED BY THE COMPANY OR ANY AFFILIATE**

If any loss is covered partly by this **Coverage Part** and partly by any prior canceled or terminated insurance that the Company or any affiliate had issued to the **Insured** or any predecessor in interest, the most the Company will pay is the larger of the amount recoverable under this **Coverage Part** or the prior insurance.

**D. EXAMINATION OF BOOKS AND RECORDS**

The Company may examine and audit the **Insured's** books and records as they relate to this **Coverage Part** at any time during the **Policy Period** and up to three years afterward. The **Insured** must keep records of all property covered under this **Coverage Part** so that the Company can verify the amount of any loss.

**E. INSPECTIONS AND SURVEYS**

The Company shall have the right but is not obligated to make inspections and surveys at any time; give the **Insured** reports on the conditions the Company finds; and recommend changes. Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. The Company does not make safety inspections. The Company does not undertake to perform the duty of any person or organization to provide for the health and safety of workers or the public and the Company does not warrant that conditions are safe or healthful or comply with laws, regulations, codes or standards.

This condition applies not only to the Company, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**F. OWNERSHIP OF PROPERTY – INTERESTS COVERED**

The property covered under this **Coverage Part** is limited to property that the **Insured** owns or holds or for which it is legally liable. However, this insurance is for the **Insured's** benefit only. It provides no rights or benefits to any other person or organization.

D00013

**VI. <u>ADDITIONAL CANCELLATION PROVISIONS</u>.**

**This insurance is canceled as to any Employee:**

**1. immediately upon discovery by the Insured or any of its partners, officers or directors not in collusion with the Employee of any dishonest or criminal act committed by that Employee in excess of $1,000, whether:**

a. employed by the **Insured**; or

b. prior to becoming employed by the **Insured**, provided such dishonest act results in a loss equal to or more than $1,000.

2. on the date specified in a notice mailed to the **Parent Corporation**. That date will be at least 60 days after the date of mailing.

**VII. <u>EMPLOYEE BENEFIT PLAN PROVISIONS – ERISA INFLATION GUARD</u>.**

In compliance with certain provisions of **ERISA**:

1. If the **Parent Corporation** named in this **Coverage Part** Declarations is an entity other than a **Pension Plan** or **Welfare Plan**, any payment the Company makes to that **Insured** for loss sustained by any **Pension Plan** or **Welfare Plan** will be held by that **Insured** for the use and benefit of the **Pension Plan** or **Welfare Plan** sustaining the loss.

2. If two or more **Pension** or **Welfare Plans** are insured under this insurance, any payment the Company makes for loss:

a. sustained by two or more **Pension** or **Welfare Plans**, or

b. of commingled funds or other property of two or more **Pension** or **Welfare Plans**

is to be shared by each **Pension** or **Welfare Plan** sustaining loss in the proportion that the amount of insurance required for each such **Pension** or **Welfare Plan** under **ERISA** provisions bears to the total of those amounts.

3. If, at the inception of this **Policy** or any earlier policy with the Company that provided ERISA Fidelity coverage, the **Insured** has or had a Limit of Liability under the ERISA Fidelity Insuring Agreement for its **Pension** or **Welfare Plans** that is or was equal to or greater than that required under **ERISA**, and at the same time had Inflation Guard coverage, the Company agrees to increase automatically the Limit of Liability for Insuring Agreement G., subject, however, to Section III.C.4.e. of the Common Terms and Conditions of this **Policy**, to equal the amount required under **ERISA** at the time the loss was discovered.

Includes copyrighted material of Insurance Services Office and the Surety Association of America

D00014

COPY

**POLICY INFORMATION** **The St Paul**

**THIS IS NOT A BILL.**

**YOUR POLICY IS DIRECTLY BILLED. IF THIS IS A POLICY CHANGE, THE ADDITIONAL OR RETURN PREMIUM WILL BE SHOWN ON FUTURE INSTALLMENT BILLINGS. IF ALL INSTALLMENTS HAVE BEEN BILLED, THE PREMIUM CHANGE WILL BE BILLED OR CREDITED PROMPTLY.**
**A BILL WILL BE SENT TO:**
THE INSURED

**Company:** ST. PAUL FIRE & MARINE INSURANCE COMPANY

**INSURED**
ERWIN PEARL, INC.
735 ALLENS AVENUE
PROVIDENCE RI 02905

**Policy Inception/Effective Date:** 02/10/03
**Policy Number:** CK05700250
**Agency Number:** 3801980

**Transaction Type:**
ENDORSEMENT OF POLICY
**Transaction number:** 003
**Processing Date:** 04/18/03 07:37

**AGENT**
THE PRESTON AGENCY INC
250B CENTERVILLE RD
WARWICK RI 02886

| Policy Number | Description | Amount | Surtax/ Surcharge |
|---|---|---|---|
| CK05700250 | SERIES 1000 ENDT - RETURN PREMIUM | $23,616.00- | |
| CK05700250 | NEW YORK INSURANCE FEE | | $49.54- |

THE PREMIUM SHOWN DOES NOT INCLUDE A PREMIUM PAYMENT PLAN SERVICE CHARGE. IF YOU SELECTED A PREMIUM PAYMENT PLAN YOUR PAYMENT SCHEDULE/BILL WILL SHOW THIS CHARGE.

THIS POLICY IS ON A NINE PAY PAYMENT PLAN.
A PAYMENT SCHEDULE/BILL WILL FOLLOW SHORTLY.

| PREMIUM | COMM. RATE | SURTAX/ SURCHARGE |
|---|---|---|
| $23,138.00- | 15.0% | |
| $478.00- | 25.0% | |
| | .0% | $49.54- |



COMPANY COPY

SP0077