# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

ARMBRUST INTERNATIONAL, LTD.
and ERWIN PEARL, INC.,
Plaintiffs,

v.

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA and ST. PAUL FIRE AND MARINE INSURANCE COMPANY,
Defendants.

C.A. No. 04-212 ML

## PLAINTIFFS' REPLY TO TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA'S OBJECTION TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs Erwin Pearl, Inc. and Armbrust International, Ltd., through counsel, submit the following reply to the Memorandum of Defendant, Travelers Casualty & Surety Company of America ("Travelers"), in Opposition to Plaintiffs' Motion for Summary Judgment ("Opposition").

Travelers argues that "(a) the St. Paul and Travelers policies are entirely different types of policies; and (b) relevant terms of the St. Paul and Travelers policies are completely different." Opposition at 2. Travelers is simply wrong. The label that an insurance company applies to its policy does not alter the meaning of the policy language, and the coverage language of both policies is virtually identical. The St. Paul 2002-2003 policy provided that "[w]e'll pay for loss or damage to money, securities or other property resulting directly from theft by any of your employees." The Travelers 2003-2004 policy provided that Travelers would indemnify the insured for "[d]irect loss of, and direct loss from damage to, Money, Securities, and other property resulting from Employee Theft."

Travelers further argues that its policy was written on a "loss sustained" basis, meaning that there is coverage only for embezzlement that takes place during the policy period. Opposition at 2. This argument might have some merit if the Fidelity Coverage Part of the

Travelers policy actually said that it only covered losses sustained during the policy period, but it does not. Instead, the policy says that "this Coverage Part applies to loss which occurs during the Policy Period." In Rhode Island, a property loss occurs when it is discovered or in the exercise of reasonable diligence could be discovered. *CPC International v. Northbrook Excess & Surplus Insurance Co.*, 668 A.2d 647 (R.I. 1995). Travelers does not dispute that an embezzlement loss is a loss of property.

Travelers next attempts to disown its agent, The Preston Agency ("Preston"). Opposition at 3-4. According to Travelers, an issuing agent's representations to the insured regarding the scope of the policy are not binding on the insurance company. This position is not consistent with the law.

In *Etheridge v. Atlantic Mutual Insurance Co.*, the Rhode Island Supreme Court drew a distinction between an insurance agent's actions in selecting an insurance company with which to place the risk and the agent's actions once the insurance company was selected. The Court found that in selecting the company, the agent acted on behalf of the insured. The Court also found, however, that once the insurance company was selected, the agent acted on behalf of that insurance company:

> In his capacity as adviser, distributing the risk and determining the appropriate amount of coverage to obtain from any of the companies among whom the risk might be distributed, Nichols was acting as agent of the Mongillos rather than of any of the carriers. Once he decided to issue a policy, he was, of course, Atlantic's authorized agent in issuing the policy for the amount stated, but not in the initial determination of fixing that amount.

*Etheridge*, 480 A.2d 1341, 1346 (R.I. 1984).[1] It is undisputed that Plaintiffs already had

---

[1] This distinction is reflected in other cases which hold that once the insurance company is identified, it may be bound by the acts of its agent. *Cardente v. Maggiacomo Ins. Agency*, 108 R.I. 71, 73 (1971) ("an insurance agent who fails to make policy changes requested by an insured is not responsible to the insured for that failure if when he agreed to procure the change he was acting for a disclosed carrier and had authority to do what he agreed to do. While the rule may appear to be harsh, the third party is not remediless for in law the disclosed principal is just as

coverage from Travelers in the beginning of 2003, and that the employee dishonesty insurance was added to the existing Travelers coverage. Plaintiff's Undisputed Facts ("UF") Nos. 42-45. As the entity through which Plaintiffs' existing Travelers coverage was issued, Preston was clearly doing more than merely soliciting or accepting applications, and was therefore acting as Travelers' agent in early 2003. As Travelers' agent, Preston had authority to bind coverage as represented to the insured.

Indeed, the Rhode Island Supreme Court has previously applied this reasoning to hold that Mr. Capone of Preston was an agent of Travelers' predecessor in interest, Aetna. *AAA Pool Service v. Aetna Casualty & Surety*, 479 A.2d 112 (R.I. 1984). Holding that Aetna could be liable for alleged defamatory remarks made by Mr. Capone about the plaintiff, the Court stated that

> [c]ontrary to Aetna's contention, Capone was more than a mere soliciting agent, as was the case in *daSilva v. Equitable Fire & Marine Insurance Co.*, 106 R.I. 729, 263 A.2d 100 (1970). Rather, Capone had authority to bind Aetna and was in fact an agent of the company for that purpose.

479 A.2d at 115. Preston's agreement with Travelers that was in effect in 2003 likewise gave it the authority to bind the insurer. Capone Depo. at 240; see also UF No. 7 and Capone Depo. at 234-237.[2] Travelers' assertion that Preston was not its agent is contrary to the facts and the law.

---

much bound as if the agent had fully performed his agreements.") (citations omitted); *General Accident Ins. v. American National Fireproofing*, 716 A.2d 751, 757 (R.I. 1998) ("In issuing the certificate, however, Wilson and Rowan were acting as General Accident's agents pursuant to the agency agreement. Accordingly, to the extent that these certificates evince liability coverage, General Accident is bound by the terms of the underlying policy."); *cf. Paul Revere Life Insurance Co. v. Fish*, 910 F. Supp. 58, 64 (D.R.I. 1996) (agent "empowered merely to solicit or accept applications" is agent of the insured).

[2] Mr. Capone testified during his deposition as follows:

> Q: In connection with the agency relationship between the agency and the carriers, the agency had the power to bind the carriers within the rules and regulations established by the carriers, correct?
>
> A: Correct.

Capone Depo. at 240. He also testified that Travelers succeeded Aetna in the 1990's. Capone Depo. at 94.

Travelers cites *General Accident Ins. v. American National Fireproofing*, 716 A.2d 751 (R.I. 1998), to argue that it has no liability. Opposition at 9. In *General Accident*, however, there was no evidence that the insured had relied to its detriment on representations by the agent regarding the insurance being secured. The Court said:

> we perceive no evidence that would support a conclusion that General Accident misled Cuddy Construction, American, or Ruscon into believing that American had coverage under any policy other than SMP 610915 or that the parties justifiably relied on the certificates as separate and independent contracts. On the contrary we find it very telling that until the morning trial all of the parties indicated that coverage for American was being sought under policy SMP 610915. Therefore, we affirm the trial justice and conclude that the application of the doctrine of estoppel is inappropriate to establish a separate contract.

716 A.2d at 756. In contrast to the facts of *General Accident*, it is undisputed here that Preston told Erwin Pearl that Travelers was providing employee dishonesty coverage in excess of the St. Paul policy. UF No. 44. Erwin Pearl relied to its detriment on this representation, reasonably believing that the coverage from Travelers replaced the coverage up to $500,000 that it previously had from St. Paul. *Id.*

Finally, Travelers argues that Preston believed that coverage under the St. Paul policy was equivalent to coverage under the Travelers policy only as to policy limits. Opposition at 9-10. On the contrary, Preston witnesses repeatedly made it clear that they perceived no material differences between the St. Paul and Travelers employee dishonesty coverages:

> Q: OK, did it occur to you at the time you were recommending to Erwin Pearl that it buy the employee dishonesty coverage from Travelers that if Erwin Pearl had a loss for employee dishonesty that was discovered after the policy took effect, that the policy wouldn't be covered because the embezzlement occurred before the policy period?
>
> A: No.

Capone Depo. at 55.

> Q: And back in 2002/2003 you had no idea whether the St. Paul employee dishonesty policy and property policy was the same or different than the employee dishonesty coverage in the Travelers policy, correct?
>
> A: I had no reason to believe it was any different.

Capone Depo. at 61.

> Q: Let me rephrase that question. You understood when you purchased for Erwin Pearl the Travelers fidelity coverage in February 2003, that there were differences between it and the employee dishonesty coverage that had been provided under the St. Paul property policy, right?
>
> A: I don't know – I was not aware at that time of any difference.

Capone Depo. at 88; *see also* Wright Depo. at 16 (comparing 2001-2002 St. Paul policy with prior Travelers crime coverage); Wright Depo. at 113-118, 120. Travelers' argument that its agent perceived the policies to be similar only as to the policy limits is overwhelmingly refuted by the record.

ARMBRUST INTERNATIONAL, LTD.
and ERWIN PEARL, INC.

By Their Attorneys,

PARTRIDGE SNOW & HAHN LLP

Steven E. Snow (#1774)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: October 17, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing ARMBRUST INTERNATIONAL, LTD. AND ERWIN PEARL, INC.'S REPLY TO TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA'S OBJECTION TO MOTION FOR SUMMARY JUDGMENT was mailed, postage prepaid, on this 17th day of October, 2005 to:

Anthony R. Zelle, Esq.
Denner O'Malley, LLP
Four Longfellow Place
35th Floor
Boston, MA 02114

John J. Flanagan, Esq.
2348 Post Road
Warwick, RI 02886

Stephen H. Burke, Esq.
Ratcliffe, Burke, Harten & Ellis LLP
1600 Financial Plaza
Providence, RI 02903

Robert J. Maselek, Jr., Esq.
Mark E. Cohen, Esq.
The McCormack Firm, LLC
One International Place
7th Floor
Boston, MA 02110

822669_1/3119-3

discovered by Erwin Pearl during the Travelers policy period, whether that would be covered or not?

THE WITNESS: Did I -- could you read that back again?

(QUESTION READ)

A. Whether the employee dishonesty loss would be covered or not? Yes.

Q. What did you determine in that regard?

A. I don't know if I determined --

MR. SNOW: Objection. Calls for a legal conclusion.

A. I don't know if I determined anything.

MR. COHEN: Could you read back the previous question again and answer?

(LAST TWO QUESTIONS AND ANSWERS READ)

Q. What was it that you considered about whether there would be coverage in such a situation?

MR. SNOW: Objection. Calls for a legal conclusion.

MR. VAN TIENHOVEN: Same objection.

A. I was considering the amount of coverage that he would have at the point of loss.

Q. What does that mean?

A. If you discovered a loss when he only had



$25,000 in coverage.

Q. But we were talking about the Travelers WRAP policy, which they were talking about $500,000 of coverage, right. That's what I asked you about in that question.

A. I may have been confused with what you were asking.

Q. Okay. Did it occur to you at the time you were recommending to Erwin Pearl that it buy the employee dishonesty coverage from Travelers that if Erwin Pearl had a loss for employee dishonesty that was discovered after the policy took effect, that the policy wouldn't be covered because the embezzlement occurred before the policy period?

A. No.

Q. In recommending what coverages an insured should buy, do you feel it's important for the insurance broker or agent for the insured to read the policy to see exactly what it says?

MR. SNOW: Objection, form of the question.

MR. VAN TIENHOVEN: Objection. Same.

A. I don't know.

Q. So it may be important, and it may not be



important, you don't know?

A. It may be important, it may not be important.

Q. What would affect whether it's important or not important?

A. I don't know.

Q. Okay. Is it your practice before you recommend coverages to your clients to read the policy to see what exactly they cover and what the language is?

THE WITNESS: Is it my practice do that?

MR. COHEN: Yes.

THE WITNESS: To read the policies?

MR. COHEN: Yes.

A. No.

Q. In any event, you didn't do that with employee dishonesty coverage or the fidelity coverage that was part of the WRAP policy before Erwin Pearl bought it in 2003, correct?

A. Yes.

MR. COHEN: I'm going to mark this as the next exhibit.

(DEFENDANT'S EXHIBIT 10 MARKED FOR IDENTIFICATION)

THE WITNESS: Okay.



Q. That's a memo dated February 18, 2003, correct?

A. Yes.

Q. Do you know who wrote it?

A. Looks like I did.

Q. And it says, "RSQ spoke with to Dan Boermeester" --

A. Boermeester.

Q. -- "at Travelers today." Who is RSQ?

A. Robert Quigley.

Q. He's somebody that worked for you at the Preston Agency?

A. Excuse me, I didn't write this.

Q. Who wrote it?

A. Rob Quigley.

Q. Okay. In any event, Robert Quigley worked for you at the Preston Agency?

A. No.

Q. Who is he?

A. Robert Quigley is the underwriting manager at Preston.

Q. But he was an employee of the Preston Agency?

A. Yes. You said did he work for me.

Q. What was his duties as underwriting manager for the Preston Agency back in February of 2003?

A. He would take applications that were provided

to him, ask questions of the producer, try to accumulate information, underwriting an account and market to insurance companies.
Q. And it goes on to say that, "He said he had a conversation with MT," quote, 'the other day,' end quote, "wherein he said he could quote crime but would exclude the precious metals." Who is MT?
A. Melissa Tanguay.
Q. And when it says, he said he had a conversation, do you have any idea who he is in that sentence?
MR. VAN TIENHOVEN: Objection as to form.
A. It would be Dan Boermeester, the way I read this.
Q. So you read it to mean that Boermeester told Quigley that Boermeester had a conversation with Tanguay recently or shortly before that in which Boermeester said that he could quote crime coverage for Erwin Pearl, right?
A. Yes.
Q. And Melissa told him to go ahead and quote it, correct?
A. Yes.
Q. And then it says that Quigley called JAW, who I take it is Judy Wright, right?



A. Yes.
Q. And she said, okay to quote it that way without the precious metals, right?
A. Yes.
Q. And then Quigley goes on to say that he called Boermeester again, and Boermeester said that, "He would quote the crime coverage," quote, but as part of the WRAP policy," unquote; is that right?
A. Yes.
Q. And is that something that was relayed to you in February of 2003?
A. I don't remember it. It could have been.
Q. Okay. By the way, do you ever recall reviewing the employee dishonesty section of the St. Paul property policy?
A. No.
Q. To this day you haven't seen it?
A. I have reviewed the policy but I haven't studied it, no.
Q. When did you first review the policy?
A. When I was looking for coverage for the insured.
Q. So at that time you did look at the policy back in 2001?
A. Yes.



Q. And do you recall whether you looked at the employee dishonesty section of the St. Paul property policy in 2001 or 2002?
A. 2001? I'm sorry. Your time line is --
Q. 2001 is the first time you bought the St. Paul policy --
A. Yes. Right.
Q. -- for Erwin Pearl, right?
A. Yes.
Q. Are you saying that you looked through the policy then in 2001 or in 2002 or when was it that you first looked at the St. Paul property policy?
A. Probably 2003 or '4.
Q. So, after the embezzlement loss came to light?
A. Yes.
Q. But before the Erwin Pearl found out that Ms. Gardner had been embezzling money, you had never looked at the St. Paul property policy at all, right?
A. Not the policy provision, no.
Q. So you didn't know what language that policy used with respect to employee dishonesty losses at that point, right?
A. No.
Q. And is it fair to say that a property policy is an



entirely different type of policy coverage than a WRAP policy?
MR. SNOW: Objection. Calls for a legal conclusion.
MR. VAN TIENHOVEN: Same objection.
A. I don't know.
Q. You don't know?
A. No.
Q. You think they may be exactly the same type of policy?
MR. VAN TIENHOVEN: Same objection.
MR. SNOW: Same objection.
A. I don't know, they could be.
Q. And back in 2002/2003 you had no idea whether the St. Paul employee dishonesty policy and property policy was the same or different than the employee dishonesty coverage in the Travelers policy, correct?
MR. VAN TIENHOVEN: Do you need it reread?
THE WITNESS: Yes.
(QUESTION READ)
A. I had no reason to believe it was any different.
Q. Certainly, if you had read both policies, you

"brokerage," and we have limited binding authority with our contract companies. Our binding authority is not all-encompassing." What did you mean by that?
A. We were an agency, while representing insurance companies rather than a brokerage, without a contract with an insurance company. Brokerage implies no contract with an insurance company.
Q. Okay. But like a brokerage, as an independent agent, you were representing the insureds' interest, correct?
A. Yes.
Q. And ultimately, I notice that the affidavit that you signed in December referred to Preston Agency as being a brokerage, why was that?
A. I don't know. Where was that referring to? Where was that?
MR. COHEN: It's in the final affidavit which I have, I'll get to it in a second.
Q. Referring to Paragraph 5, I guess, the part on Page 2 says, "Finally, we are not at all comfortable with the language you have on Page 3. Erwin Pearl did not have the exact same overall



protection that they did prior, and it was never represented to them that they did." Is that a correct statement?
A. Yes.
Q. And did Erwin Pearl at any time ask you whether the Travelers fidelity portion of the WRAP policy provided the same overall protection as the prior employee or the employee dishonesty coverage that Erwin Pearl had with St. Paul?
A. No.
Q. And you didn't have any discussions, as far as you can recall, with Erwin Pearl comparing and contrasting the Travelers fidelity WRAP coverage with the St. Paul property dishonesty coverage around the time that the Travelers fidelity coverage was placed in early 2003, correct?
A. Right.
Q. Then you go on to say, "We would never tell an insured that. It would be highly unusual for two insurance companies' forms to be exactly alike. In this case, Travelers used a true crime form, whereas, St. Paul provided their fidelity coverage under their property form." Is that a correct statement, to your knowledge, today?
A. Yes.



Q. So you would have expected that there would be differences in the nature of the coverage provided by Travelers and St. Paul, right, because they're two different types of policies, right?
MR. SNOW: Objection. Form of the question.
THE WITNESS: You're asking me would I have --
Q. Let me rephrase that question. You understood when you purchased for Erwin Pearl the Travelers fidelity coverage in February 2003, that there were differences between it and the employee dishonesty coverage that had been provided under the St. Paul property policy, right?
MR. SNOW: Objection to the form of the question.
A. I don't know -- I was not aware at that time of any difference.
Q. Well, you hadn't looked at either policy at that point, right?
A. I was not provided with any policies prior to them just giving me a schedule of insurance.
Q. But here you said it would be unusual for two companies' forms to be exactly alike, right?
A. Yes.



Q. That's especially the case when they're two different types of policies, as you pointed out here, correct?
A. Yes.
(DEFENDANT'S EXHIBIT 22 MARKED FOR IDENTIFICATION)
Q. That's a memorandum that you wrote on November 9, 2004?
A. Yes.
Q. That's referring to the same affidavit we were just talking about?
A. Yes.
Q. And you said in the Exhibit 22 that Mike Brozost was mildly upset we were changing the statement about the coverage. Do you recall which statement you were referring to in Exhibit 22?
A. Which statement? No, I don't know which statement it was, unless it was the affidavit that you were asking me to sign. Not you, but --
Q. What particular statement in the affidavit were you referring to in that letter?
A. I have no idea.
Q. In that memo?
A. I really don't know.
Q. Do you think it was the portion that we were just

Page 14

providing information to St. Paul for them to develop their quotation?
A. To the best of my recollection, no.
Q. So your first involvement was after that quotation was received, putting that together into a proposal to be presented by Mr. Capone to Erwin Pearl?
A. As I recall, yes.
Q. In connection with your work in putting that proposal together, did you have an opportunity to review the existing coverages that Erwin Pearl had through another agency that were still in effect up until October 20, 2001?
THE WITNESS: By coverages, I'm not sure what you're asking me.
Q. Let me be more specific. It's my understanding that for the year prior to October 20, 2001, that among other policies, Erwin Pearl had a policy issued by Travelers that was a stand-alone crime policy with limits of $500,000 for employee dishonesty. Were you aware of that?
A. I have become aware of it, and in working with the specification information that we were provided by the client there was a page that specifically said just as you're saying, employee

Page 15

dishonesty, this limit, this company.
Q. All right. My understanding is that the proposal made by the agency to Erwin Pearl for that October 20, 2001 policy included handling employee dishonesty, not through a separate crime policy, but rather as an additional benefit to a comprehensive property policy issued by St. Paul?
MR. ZELLE: Objection.
Q. Is that accurate?
MR. ZELLE: When I make an objection, it's just to preserve it for the record, unless Mr. Cotter tells you or gives you an instruction, you just have to wait until you hear it.
MR. COTTER: Go ahead. Do you need the question read.
(QUESTION READ)
A. Insofar as that's how the quote came to me, yes, that's accurate.
Q. My question to you is at that time did you consider the proposal for handling employee dishonesty as an additional benefit to St. Paul's property coverage to be equivalent to the coverage that Erwin Pearl had in the existing policy which was the stand-alone crime policy issued by Travelers?

Page 16

MR. ZELLE: Objection.
MR. COTTER: You can answer.
A. I'm not sure that I ever thought anything different. It was -- again, these were the specifications that were provided, this is how the quote came through and taking the information is how I proposed it to the customer.
Q. Okay. Well, I want to make sure I understand you, so I'm going to try to rephrase the way I understand what you said, and if it's not accurate, tell me. Is it fair to say that at least from your point of view, what you were proposing in terms of $500,000 worth of employee dishonesty coverage was, in your view, essentially equivalent to the type of coverage that Erwin Pearl had in the prior year?
A. Yes.
Q. Okay. Now, am I correct that it was your practice that once a -- withdrawn. You put together the proposal for Mr. Capone to present to Erwin Pearl for the October 20, 2001 policy year, correct?
A. Yes.
Q. And eventually, at some point that proposal was accepted by the client?
A. Yes.

Page 17

Q. And St. Paul issued a policy; correct?
A. Yes.
Q. And at some point in time, after the policy was issued, you communicated with the underwriter at St. Paul with respect to your review of the policy after it was issued and certain issues that arose based upon your review?
A. Yes.
Q. Is that your standard practice, that once a policy is issued, that you have responsibility for that you would review it, and if there are any errors, that you would then communicate with the underwriter?
A. Yes.
Q. And does that happen frequently?
A. Every policy that comes through the door.
MR. SNOW: Can you mark this as Exhibit 25. I'm going to be using, with possibly one exception, the same exhibits and same numbers that we used in the Capone deposition.
MR. ZELLE: If you want, I have the Capone exhibits.
MR. SNOW: I made copies of the ones I'm going to use, so they should match up.

Page 110

Q. Okay. Obviously, you can testify what he knows -- what I'm asking is your understanding?
A. I have no knowledge of what he did or didn't --
Q. I think we're just ships passing in the night here. Your understanding as to what Erwin Pearl understood is what I'm asking, you can't tell me what they understood, but you can tell me what you believed they understood based on what was communicated to them. So you can't get inside of their mind. If you don't know, if you never thought my insured or my client or Erwin Pearl, in this case, had an understanding or didn't have an understanding, you can tell me that. But the question I have for is, based on the communications you had with Mr. Capone, based on communications you had with Mr. Brozost, do you believe that Erwin Pearl understood that the effective date of the employee dishonesty limit of $25,000 was October 20th, 2002?
MR. SNOW: Objection. Form of the question.
MR. COTTER: Objection. If you know.
A. I don't know.
Q. Having looked at the policy, is it clear to you

Page 111

that the effective date of the $25,000 limit for employee dishonesty coverage was October 20, 2002?
MR. SNOW: Objection. Calls for a legal conclusion.
MR. COTTER: Objection. You can answer.
A. Based on the quotation or proposal I had received from Stan Wright for the renewal policy effective October 20th, 2002 to 2003, he indicated that $25,000 limit that would have been my understanding as of that date.
Q. As of November 26th, 2002?
A. Yes, backdating to the effective date of the policy.
Q. And you were shown by Mr. Snow an exhibit which showed the coverage limits for various coverages that misstated the limit for employee theft to be $500,000; do you recall that document?
MR. SNOW: Objection. Form of the question.
THE WITNESS: You're referring to the additional benefits coverage page of the policy, yes. I recall that document.
Q. And that was a mistake, wasn't it?
MR. SNOW: Objection. Form of the

Page 112

question.
A. I don't know.
Q. When you saw the policy in April of 2003, you wrote back to Mr. Wright that it appeared to be a mistake, didn't you?
A. I don't believe that's what I said.
Q. Is that the substance of what you were saying?
A. We had already placed coverage with St. Paul. We already had $500,000 worth of coverage on the WRAP -- excuse me, with Travelers at that point in time, and I had told him to issue the policy with the sublimit, with the $25,000 sublimit.
Q. So, are you suggesting that -- let me ask you this, what did you think in April of 2003 was the limit of coverage for employee theft under the St. Paul policy?
MR. SNOW: Objection.
Q. Let me put it this way, not under the St. Paul policy. What was your understanding as to what St. Paul had agreed to as of April of 2003 in terms of the limit of coverage for employee theft?
A. They had agreed to a limit of $25,000 limit of coverage to include coverage for employee theft of precious metals and jewelry.
Q. Was it also your understanding that that was a

Page 113

coverage that was accepted by Erwin Pearl?
A. Based on Mike's signature on the March revised proposal and fax backdated, I think March 6th, reference you just made, yes.
Q. Now, you made reference earlier to your file and can you tell me at some point there were documents produced by the Preston Agency, did that include all the materials in your file?
A. My file -- I don't have a file. I say my file as the agency file.
Q. You didn't have a personal file?
A. No, I did not.
Q. The additional benefit in the St. Paul policy for employee theft, is that in terms of the -- I'm not asking about limits at this point, the scope of coverage provided, the same coverage that is afforded under a commercial crime policy for employee theft?
A. I'm going to qualify my answer. With respect to property coverage and perils insured against, yes, it is.
Q. Are you aware of any distinctions between coverage that is afforded under a commercial crime policy for employee theft and the coverage that was provided as an additional benefit for employee

theft under the St. Paul property form?
A. Not specifically.
Q. Are you familiar with the term claims-made policy?
THE WITNESS: As respects a crime policy?
MR. ZELLE: Just in general terms.
A. Yes, I am.
Q. And can you distinguish that from policies that are not written on a claims made basis?
A. I'll use general liability as a line of coverage. On a normal -- most commonly used form, coverage is provided for bodily injury or property damage arising out of an occurrence, as long as it's in the coverage territory and during the policy term, and there is a limitation as to the need to report it in the same year. Claims-made policy, on the other hand, for coverage to be afforded under a particular policy term, the incident has to happen, and the claim has to be made within the term of the policy, much more limiting from a general liability standpoint.
Q. The employee dishonesty additional benefit was written on a property form, right?
A. Yes.
Q. Okay. So, in terms of the example you just gave,



that's not necessarily applicable to the distinction between the commercial crime coverage form and the St. Paul form used in this case?
A. I interrupted. Could I impose on you to restate it?
Q. You gave an example between a claims-made policy with a general liability policy. I want the record -- or you to make clear on the record that the employee dishonesty benefit that is a subject of this litigation is not in a general liability policy?
A. I agree, yes.
Q. Can you make a distinction then between the commercial crime coverage which is written on a claims-made basis and the employee dishonesty benefit that was provided under the St. Paul policy to Erwin Pearl?
MR. SNOW: Objection. Form of the question.
MR. COTTER: Objection. You can answer.
A. I'm not -- I've not heard the term claims made in conjunction with a crime policy. It's not a term I'm familiar with.
Q. The Travelers policy that was issued to Erwin



Pearl, the WRAP policy, are you familiar with that?
A. I've reviewed it, yes.
Q. And there was a fidelity part that was added effective February, I believe it was February 25th of 2003, right?
A. Yes.
Q. And do you know whether that was written on a claims made basis?
A. Again, I've not heard the term claims-made used in conjunction with crime coverage.
MR. COHEN: Off the record.
(OFF THE RECORD)
Q. Maybe I should use that term if that will help. Let me just frame the question this way, are you familiar with the distinctions between the commercial crime policy that was issued by the Travelers in this case and the coverage afforded under that policy for employee theft and the coverage that was provided under the additional benefit of the St. Paul policy for employee theft apart from the difference in limits?
MR. SNOW: Objection. Form of the question.
MR. COTTER: Objection.



THE WITNESS: Can you just do that one more time; I'm struggling with this one?
Q. Sure. Let me put it into context. At the time that you informed Mr. Brozost that Travelers had agreed to afford coverage for employee theft under the commercial crime policy, did you consider any differences in the coverage afforded under that Travelers policy and the coverage afforded under the St. Paul policy?
MR. COTTER: Objection. Do you mean her personally or the agency?
MR. ZELLE: No, her.
A. I did not recognize any, I didn't -- it wasn't anything that I did. I did not.
Q. My question is did you consider it. You didn't?
A. No.
Q. Are you aware as to whether Mr. Capone ever communicated with Mr. Brozost about any differences in coverage between the Travelers policy and the St. Paul policy?
MR. SNOW: Objection. Form of the question.
A. I'm not aware that he did or didn't.
Q. Did you have any discussions with Mr. Capone about the differences, if any, in coverage afforded

under the St. Paul policy and the Travelers policy before the claim?
A. Only with respect to the issue of precious metals. The Travelers policy was going to exclude precious metals and the St. Paul policy was providing that coverage.
Q. You testified in response to some questions from Mr. Snow that you were aware of the employee theft claim that was made by Erwin Pearl; is that right?
A. Yes.
Q. Can you describe what your involvement was?
A. I was not involved at all in the claim.
Q. Okay. When I said involvement, I meant just in terms of communication. Let me use a different term. How did you become aware of it?
A. It's a relatively small office; news travels. I don't recall specifically who told me, if it was verbal or E-mail. I just don't recall.
Q. Did you discuss the claim in any manner, general terms or specifically with anyone at the Preston Agency?
A. In the early time frame? Not that I recall.
Q. What do you mean early time frame?
A. In the period of around the time the claim was reported into the end of 2000, no, I really



didn't. I was not involved. Other people in the office were handling this.
Q. I'm trying to be careful to distinguish between involvement as you're using that term as to what you may have heard in your relatively small office. That's what I'm asking about without confining the time frame of the early period or as you've used that term, or later period, what discussions do you remember having about the claim?
A. The claim had been presented, it was going to be sizable. The initial action that St. Paul took in looking to deny coverage based on a couple of other coverage issues. Beyond that, I really can't -- after about that point in time, I really wasn't involved.
Q. Did you have any discussions with Mr. Wright, Stan Wright about the claim?
A. Only to attempt to clarify an understanding of the issue of the coverage he was providing being primary and the Travelers policy being excess coverage over that because early on the issue was -- there was issue of other insurance, the interpretation of another insurance clause and it appeared, I was trying to clarify that point



with him.
Q. Inasmuch as you were involved in obtaining the coverage for the renewal, did you have any discussions in the course of the underwriting process with Mr. Wright as to whether the St. Paul policy would provide that under the employee theft benefit primary versus excess coverage?
A. Never had any conversation about that.
Q. Inasmuch as you had communications or were involved with communications with Travelers, was there any discussion as to whether the St. Paul policy would be excess versus primary?
A. That was clearly my intent. I'd have to check the documents to be sure that's how it was communicated back to Dan. There is a $25,000 deductible on his policy, the implication being he's going to step in excess over the primary provided by the St. Paul policy, and I specifically told Stan not to issue his quote because I had obtained excess coverage elsewhere.
Q. Okay. Do you understand what presently the -- whether there has been any coverage provided under the St. Paul policy?
A. Again, I'd have to go back and look at the file.



Q. If you don't know, you don't know.
A. I'm not sure.
Q. Okay. Just referring you again to, Exhibit 85, that's the certified copy of the policy, is there anything, and again you can feel free, I know you spent some time looking at it previously, but is there anything in that certified copy of the policy that does not conform with the terms that were agreed to between Erwin Pearl and the St. Paul?
MR. SNOW: Objection. Form of the question.
Q. Let me suggest that you might want to -- you indicated that the terms agreed to were spelled out in the -- it's exhibit -- the proposal, I guess that's Exhibit 49 and Exhibit 6. Exhibit 6 being the initial proposal that was submitted in November and Exhibit 49 being the revised -- what's referred to as property coverage exhibit and comparison. I want you to answer the question, and if it helps you to refer to those documents, you can certainly feel free to do that.
MR. SNOW: You know, in fairness, if she's going to have to refer to other documents, there are other documents she's going to need to