UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


ARMBRUST INTERNATIONAL, LTD.
and
ERWIN PEARL, INC.,
                    Plaintiffs,


v.                                                           CA 04-212 ML


TRAVELERS CASUALTY and SURETY
COMPANY OF AMERICA
and
ST. PAUL FIRE and MARINE INSURANCE
COMPANY,
                    Defendants.


MEMORANDUM AND ORDER

    This matter is before the Court on Cross-Motions for Summary Judgment filed by

Defendant Travelers Casualty and Surety Company of America ("Travelers") and Defendant St.

Paul Fire and Marine Insurance Company ("St. Paul"), as well as a Motion for Partial Summary

Judgment filed by Plaintiffs Armbrust International, Ltd. and Erwin Pearl, Inc. (collectively,

"Plaintiffs"), all pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  Plaintiffs move

for summary judgment on Count I, alleging breach of insurance contract and Count III, seeking a

declaratory judgment of the rights and obligations of the parties.  For the reasons stated below,

Defendant Travelers' Motion for Summary Judgment is granted, and those of Plaintiffs and

Defendant St. Paul are denied.


1

## I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational factfinder could render a verdict in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citation omitted). Cross-motions for summary judgment "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004) (citation omitted).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Nat'l Amusements, 43 F.3d at 735. Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).

In the instant case, the basic facts are not in dispute. Where there are no significant disagreements about the basic facts, a court may treat the parties as though they have submitted their dispute as a "case stated" and decide the case as a matter of law. See EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 (1st Cir. 1995) (citing Federación de Empleados del

2

Tribunal Gen. de Justicia v. Torres, 747 F.2d 35, 36 (1st Cir. 1984)).

Local Rule 12.1[1] requires that the party who files a motion for summary judgment must also file a statement of "all material facts as to which he contends there is no genuine issue necessary to be litigated." D.R.I. Loc. R. 12.1(a)(1). The nonmoving party must submit a responsive statement identifying the facts "as to which he contends there is a genuine issue necessary to be litigated." D.R.I. Loc. R. 12.1(a)(2). Plaintiffs submitted an extensive Statement of Material Facts Not in Dispute ("SMFND"). While Travelers and St. Paul do not dispute Plaintiffs' factual assertions, they do dispute the legal characterizations that are imbedded in many of Plaintiffs' fact statements. To the extent Plaintiffs have made legal arguments in their SMFND, these have been disregarded in the Court's determination.

## II. Facts

Between May 2000 and May 2003, Michelle Gardner, an employee of Plaintiffs, embezzled approximately $323,203 by preparing improper payroll checks for other employees, fraudulently endorsing those employees' names, and depositing or cashing the checks. (Pls.' SMFND ¶¶ 55, 57.) Plaintiffs discovered the fraudulent activity in May 2003 and terminated Ms. Gardner's employment on May 8, 2003. (Pls.' SMFND ¶ 56.) On May 29, 2003, Plaintiffs gave notice of the loss to St. Paul and Travelers, the two insurance carriers with whom they had contracted for employee dishonesty policies during the period in question. (Pls.' SMFND ¶ 57.)

---

[1]The United States District Court for the District of Rhode Island adopted revised Local Rules on January 1, 2006. Pursuant to Rule 101(b) of the revised rules, these new rules "become effective on January 1, 2006 and shall apply to all cases then pending and thereafter filed." D.R.I. LR Gen 101(b). Because the parties' motions for summary judgment were all filed before the effective date of the revised rules, this Court applies the rule in force at the time of filing, Local Rule 12.1.

In order to resolve the question of which policy or policies cover which portion or portions of Plaintiffs' loss, an accounting of the relevant policy coverage in place at the time of loss is necessary.

1.      From October 20, 2001 to October 20, 2002, Plaintiffs were insured by St. Paul's Premier Property Protection Policy No. CK05700250 ("St. Paul policy 1"), which included as "Additional Coverage" protection against employee dishonesty, with a policy limit of $500,000 and a $5,000 deductible. (Pls.' SMFND ¶ 11; St. Paul's Rule 12.1 Statement in Support of Motion for Summary Judgment ("12.1 Stmt.") ¶¶ 1, 3, 6.) Relevant policy language indicates this policy covered "loss or damage to money, securities, and other covered business personal property that results directly from employee dishonesty." (St. Paul's 12.1 Stmt. ¶ 3.) "Employee dishonesty means only dishonest acts committed by an employee whether identified or not while acting alone or with other persons, with the intent to:

- •      Cause you a loss; and

- •      Obtain personal benefit; or

- •      Obtain financial benefit for any person or organization intended by the employee to receive that benefit." (St. Paul's 12.1 Stmt. ¶ 4.)

2.      From October 20, 2002 to October 20, 2003, Plaintiffs were insured by St. Paul's Premier Property Protection Policy No. CK05700250 ("St. Paul policy 2"), which included as an "Additional Benefit" protection against employee theft, with a policy limit of $25,000. (St. Paul's 12.1 Stmt. ¶ 1, 5, 7.) The relevant policy section defines the coverage in these terms: "We'll pay for loss or damage to money, securities or other property resulting

4

directly from theft by any of your employees. This can be money, securities or other property you own or that you're holding, whether or not you're liable for its loss." (St. Paul's 12.1 Stmt. ¶ 5.) "This protection applies only when there is evidence that the employee meant to cause you a loss. This evidence must also show that the employee intended that he or she or another person or organization would get some unearned financial benefit." (St. Paul's 12.1 Stmt. ¶ 5.)

3.      From February 25, 2003 to March 12, 2004, Plaintiffs had employee dishonesty coverage under Travelers' Wrap Policy No. 103287494, which they added to other coverage already in place with Travelers under that policy. (Pls.' SMFND ¶ 48; Travelers' SMFND ¶¶ 5, 6.) The relevant policy language is as follows:

> [T]he Company agrees to indemnify the Insured for: A. Employee
> Dishonesty. Direct loss of, and direct loss from damage to, Money,
> Securities and other property resulting from Employee Theft. . . .
> "Employee Theft" means the unlawful taking of Money, Securities
> and other property to the deprivation of an Insured by an
> Employee, whether identified or not, acting alone or in collusion
> with others.

(Pls.' SMFND Ex. B at 1, 3.)   In its Discovery section, the policy also placed the following limitations on recovery:

> [T]his Coverage Part applies to loss which occurs during the Policy
> Period. Loss is covered under this Coverage Part only if
> discovered no later than 120 days following termination or
> cancellation of the Insuring Agreement or termination of this
> Coverage Part as to an Insured . . .

(Pls.' SMFND Ex. B at 6.) Another relevant portion of the Travelers policy is the Loss Sustained During Prior Insurance provision, which states:

> If the Insured or a predecessor in interest sustained loss during the

period of any prior insurance that it or the predecessor in interest
could have recovered under that insurance except that the time
within which to discover loss had expired, the Company will pay
for it under this Coverage Part, provided:

    a.    this Coverage Part became effective at the
time of cancellation or termination of the
prior insurance; and

    b.    the loss would have been covered by this
Coverage Part had it been in effect when the
acts or events causing the loss were
committed or occurred.

(Pls.' SMFND Ex. B at 7.)

Plaintiffs contend that St. Paul policy 2 was not in place from October 20, 2002 to October 20,

2003, as detailed above, because negotiations concerning the terms of renewal of St. Paul policy

1 continued through February 2003 without a replacement policy in place.  Plaintiffs nonetheless

concede that on March 6, 2003, Michael Brozost, Vice President and Legal Counsel of Erwin

Pearl, "signed a premium summary acknowledging the premiums and coverages purchased

effective October 20, 2002.  The summary showed $25,000 of Employee Dishonesty coverage . .

."(Pls.' SMFND ¶ 47.)  Although Plaintiffs have not submitted a copy of the "premium

summary" labeled as "Deposition Exhibit 49," neither of the Defendants disputes the content of

the letter as asserted by Plaintiffs.  Therefore, the Court accepts Plaintiffs' representation of the

content of the letter, and finds its effect was to render St. Paul policy 2, with a coverage limit of

$25,000 for employee theft, effective from October 20, 2002 to October 20, 2003.

      A contract of insurance, like any other contract, requires a manifestation of mutual assent

in the form of an offer by one party which is accepted by the other party.  John Hancock Mut.

Life Ins. Co. v. Dietlin, 199 A.2d 311, 313 (R.I. 1964).  An application for insurance is ordinarily

an offer which must be unconditionally accepted before an insurance contract comes into

existence. Id. Brozost's signature on the summary operated as an acceptance of the terms St. Paul offered in its summary, and therefore, the insurance agreement between St. Paul and Plaintiffs came into existence upon his signing of the summary. Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214, 223 (D.R.I. 2004) (finding that signature of Chief Operating Officer on insurance company's proposal operated as acceptance of insurance contract offer). Because one of the terms of the offer delineated in the summary was that the policy be made effective October 20, 2002 to October 20, 2003, Brozost's acceptance of that offer rendered St. Paul policy 2 effective through those dates.

Plaintiffs further dispute the coverage dates detailed above by arguing they were not given proper notice of the reduction in coverage effected by St. Paul policy 2. Plaintiffs refer to Regulation 38, Section 5 of the Rhode Island Department of Business Regulation, Division of Insurance Regulation, which states in relevant part:

> An insurer shall provide to the first-named insured . . . written notice of premium increase, change in deductible, reduction in limits or coverage at least thirty (30) days prior to the expiration date of the policy . . . . If the insurer fails to provide such notice, the coverage provided to the named insured shall remain in effect until notice is provided or until the effective date of replacement coverage obtained by the named insured, whichever first occurs.

R.I.D.B.R. Ins. Reg. 38 available at http://www.dbr.state.ri.us/rules_regs/id_rules.html. Plaintiffs assert that St. Paul did not provide notice of the reduction in limits, and therefore, "the policy limit applicable to the St. Paul employee dishonesty coverage was $500,000 until Plaintiffs secured replacement coverage from Travelers." (Pls.' Mem. Supp. Summ. J. 9 n.2.) Plaintiffs' pleadings reveal that on September 19, 2002, just over 30 days before St. Paul policy 1 was to expire, St. Paul gave notice of a proposed premium increase of 30% or more but did not give

notice regarding a change in policy limits for employee dishonesty.  (Pls.' SMFND ¶ 17.)

Negotiations then ensued concerning reducing the premium increase and one of the means by

which Plaintiffs arrived at a reduced premium was to reduce employee dishonesty coverage to a

limit of $25,000.  (Pls.' SMFND ¶ 44.)  Because Plaintiffs chose the reduced coverage and

received a return of premium of $23,616 (Pls.' SMFND ¶ 53), Plaintiffs' argument that they were

given no notice of the reduced coverage limit fails.  Therefore, the effective dates of St. Paul

policy 2, with a limit of $25,000 for employee theft, was October 20, 2002 to October 20, 2003.

Because Plaintiffs also assert an estoppel claim in an attempt to bar Travelers from

denying coverage, the Court held a hearing on April 21, 2006 to establish exactly what was

communicated between Travelers, the insurance brokers, and Plaintiffs during the negotiations to

secure Plaintiffs employee dishonesty coverage.  At oral argument, Plaintiffs' counsel conceded

that Travelers made no representations to the insurance brokers or Plaintiffs to the effect that its

coverage would be equivalent to that provided by St. Paul.  Plaintiffs' counsel reiterated the

claim that the insurance brokers "believed" that the coverage Travelers had offered Plaintiffs was

essentially equivalent to the St. Paul coverage.  (Pls.' SMFND ¶ 44.)

After being notified of Plaintiffs' loss, St. Paul took the position that there was coverage

under policy 2 (covering 2002-2003) but not policy 1 (covering 2001-2002).  (Pls.' SMFND ¶

60.)  St. Paul reasoned, pursuant to <u>CPC International, Inc. v. Northbrook Excess & Surplus</u>

<u>Insurance Co.</u>, 668 A.2d 647, 650 (R.I. 1995), that a claim for property damage is covered under

the policy that is in effect when the damage manifests itself, is discovered, or in the exercise of

reasonable diligence is discoverable.  (Pls.' SMFND ¶ 60.)  Because the loss was discovered

during the 2002-2003 policy period, St. Paul explained, Plaintiffs could look only to that policy

for coverage of the entire loss. St. Paul issued Plaintiffs a check for the policy limit of $25,000. St. Paul claims it has fully discharged its obligation to Plaintiffs and moves for summary judgment of Plaintiffs' request for a declaration of the parties' rights and obligations.

In response to Plaintiffs' notification of loss, Travelers took the position that coverage under its policy only applies to loss which actually occurred during the policy period. (Pls.' SMFND ¶ 61.)  Travelers disputes the applicability of the holding in <u>CPC International,</u> discussed more fully beginning at p. 13 of this Order.  Because the amount of money embezzled during the Travelers policy period of February 25, 2003 to March 12, 2004 was $1,144.08, significantly less than the $25,000 deductible, Travelers reasoned that it did not owe any funds to Plaintiffs. (Travelers' SMFND ¶¶ 3, 4.)

Plaintiffs seek partial summary judgment on Counts I and III of their Complaint.  Count I charges Travelers with a breach of insurance contract.  Count III requests the Court issue a declaratory judgment assigning the rights and obligations of Travelers and St. Paul in this matter. St. Paul moves for summary judgment as to all of Plaintiffs' claims against it, arguing that it has fully discharged its obligations to Plaintiffs.  Travelers moves for summary judgment as to all counts of Plaintiffs' Complaint, arguing that it has no duty to indemnify Plaintiffs for the losses incurred through the embezzlement of its employee.

## III. Discussion

A federal court sitting in diversity applies the substantive law of the forum state, <u>Erie Railroad Co. v. Tompkins,</u> 304 U.S. 64, 78 (1938), including the choice of law rules.  <u>Day & Zimmermann, Inc. v. Challoner,</u> 423 U.S. 3, 4 (1975).  Where the parties have agreed about what

law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis

and accept the parties' agreement. Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st

Cir. 1991)(citing Moores v. Greenberg, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987)). Here, all three

parties agree that Rhode Island law should govern interpretation of the insurance policies. The

Court will, therefore, apply Rhode Island law to the instant dispute.

Rhode Island courts "interpret insurance policy terms according to the same rules of

construction governing contracts." Town of Cumberland v. R.I. Interlocal Risk Mgmt. Trust,

Inc., 860 A.2d 1210, 1215 (R.I. 2004). The courts "look at the four corners of a policy, viewing

it in its entirety, affording its terms their plain, ordinary and usual meaning." Id. (citing Casco

Indem. Co. v. Gonsalves, 839 A.2d 546, 548 (R.I. 2004)(internal quotation marks omitted)). The

test to be applied is not what the insurer intended by his words, but what the ordinary reader and

purchaser would have understood them to mean. Town of Cumberland, 860 A.2d at 1215 (citing

Pressman v. Aetna Cas. and Surety Co., 574 A.2d 757, 760 (R.I. 1990)). When the terms of an

insurance policy are found to be clear and unambiguous, judicial construction is at an end, and

the contract terms must be applied as written. Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550,

551 (R.I. 1990). Whether coverage exists in any given case for a particular damage-causing

event depends first and foremost upon the precise terms and conditions of the policy in question.

Textron, Inc. v. Liberty Mut. Ins. Co., 639 A.2d 1358, 1362 (R.I. 1994).


A. The Travelers Policy

Plaintiffs assert coverage by Travelers under two theories. The first is that under Rhode

Island law, property loss "occurs" for purposes of triggering insurance coverage when the loss

"manifests itself or is discovered or in the exercise of reasonable diligence is discoverable." <u>CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.</u>, 668 A.2d 647, 650 (R.I. 1995). Because the Travelers policy was in effect when Plaintiffs discovered the loss caused by Ms. Gardner's three year-long embezzlement spree , Plaintiffs argue that that policy covers the entirety of the embezzlement loss. Plaintiffs' second argument is that the loss is covered under the Travelers "Prior Insurance" clause, whereby Travelers promised to cover losses occurring during another insurance carrier's coverage period subject to certain restrictions.

In their moving papers, Plaintiffs also raise, without fully developing, an estoppel claim. Generally, arguments not fully developed are considered waived. <u>See</u> <u>United States v. Hughes</u>, 211 F.3d 676, 684 n.6 (1st Cir. 2000). However, in its opposition papers, Travelers attacks this claim, and Plaintiffs' Reply articulates the estoppel claim more completely. Essentially, Plaintiffs contend that Travelers is estopped from denying coverage for the employee dishonesty losses because the Preston Insurance Agency, Inc. ("Preston"), which Plaintiffs assert was acting as Travelers' agent, believed the Travelers policy was essentially equivalent to the St. Paul policy preceding it.

Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. <u>Hinchey v. NYNEX Corp.</u>, 144 F.3d 134, 143 (1st Cir. 1998); <u>General Acc. Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc.</u>, 716 A.2d 751, 755 (R.I. 1998). In the context of insurance coverage the insured must show (1) that he was misled by the acts or statements of the insurer or its agent; (2) that he relied on those representations; (3) that such reliance was

11

reasonable; and (4) that the insured suffered detriment or prejudice based on the reliance. General Acc., 716 A.2d at 755 (citation and internal quotation marks omitted).

Preston, the insurance brokerage firm that arranged the insurance agreements between Plaintiffs and both St. Paul and Travelers, is an independent, or non-exclusive, insurance agent, with contracts to sell insurance policies for multiple insurance carriers. (Pls.' SMFND ¶ 7; Travelers' SMFND ¶ 13). Under Rhode Island law, independent insurance brokers can simultaneously be agents of the insureds and the insurers pursuant to the doctrine of dual agency. Etheridge v. Atl. Mut. Ins. Co., 480 A.2d 1341, 1346 (R.I. 1984). Dual agency does not make an insured and an insurance company both liable for all acts of the broker agent; rather, it divides responsibility for the conduct of the agent according to the nature of the broker's actions. General Acc., 716 A.2d at 756-57. An insurance agent who represents multiple insurance companies and has the freedom to choose the company with which he would place an insurance policy is an agent of the insured to the extent of distributing the risk and determining the appropriate amount of coverage to obtain from any of the companies. Etheridge, 480 A.2d at 1346. That same broker is the agent of the insurance company to the extent of issuing insurance certificates. General Acc., 716 A.2d at 757. Therefore, to the extent an issued certificate evinces liability coverage, the insurance company is bound by its terms. Id.

The parties' statements of undisputed facts did not clearly assert the nature of representations made by Travelers or Preston during negotiations to secure Plaintiffs employee dishonesty coverage. The Court heard oral argument on April 21, 2006 to clarify the question of who said what to whom, and when. At the hearing, Plaintiffs' counsel conceded that there were no representations from Travelers to either Preston or Plaintiffs concerning the equivalence of

coverage. Plaintiffs continued to assert only that Preston believed the coverages were essentially equivalent and that this belief binds Travelers and bars it from asserting that there is no coverage. Under Rhode Island law, however, Preston was acting as Plaintiffs' agent in seeking employee dishonesty coverage from both Travelers and St. Paul. Preston's beliefs concerning coverage and the representations Preston made to Plaintiffs therefore do not bind Travelers. Without statements from Travelers, Plaintiffs' cannot show that they were misled by statements of the insurer, or that they relied on those statements, or any of the other requisite elements of an estoppel claim. Accordingly, Plaintiffs' have failed to establish a promissory estoppel claim.

Having declined Plaintiffs' invitation to bar Travelers from disclaiming coverage, the Court considers in turn Plaintiffs' two arguments countering Travelers' denial. Plaintiffs' first argument invokes CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co., 668 A.2d 647 (R.I. 1995), in which the Supreme Court of Rhode Island responded to a certified question from the First Circuit concerning what the trigger of coverage standard should be for determining at what point an "occurrence" causing property damage has taken place. The court answered the question by finding that "coverage under a general liability policy is triggered by an occurrence that takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence is discoverable." Id. at 650. The policy in question in CPC International was a comprehensive general liability ("CGL") policy in which the insurance company agreed to indemnify the insured for damages to a third party flowing from personal injuries, property damage, or advertising liability arising out of an occurrence. Id. at 649. The policy specifically defined "property damage" as "loss of or direct damage to or destruction of tangible property (other than property owned by any insured) and

13

which results in an Occurrence <u>during the policy period</u>." <u>Id.</u> at 649 (emphasis added).  The

policy then defined "occurrence" to mean "an accident, event or happening including continuous

or repeated exposure to conditions which results, <u>during the policy period</u>, in Personal Injury,

Property Damage or Advertising Liability neither expected or intended from the standpoint of the

Insured." <u>Id.</u> (emphasis added).

These coverage definitions indicate the policy at issue in <u>CPC International</u> was a third-

party liability policy requiring that the loss-causing accident, happening, or event take place

within the policy period and that the resulting property damage take place or manifest itself

within the policy period.  Cases interpreting <u>CPC International</u> have established that its definition

of "occurrence" applies only to CGL policies that limit recovery in the same way.  <u>See</u>

<u>Employers Mut. Cas. Co. v. PIC Contractors, Inc.</u>, 24 F. Supp. 2d 212, 216 (D.R.I.

1998)(distinguishing <u>CPC International</u> because policy in question did not require occurrence to

take place during the policy period, stating "the Rhode Island Supreme Court . . . applied the

manifestation rule based upon particular and specific provisions contained in the

defendant-insurer's general liability policy."); <u>Truk-Away of R.I., Inc. v. Aetna Cas. & Sur. Co.</u>,

723 A.2d 309, 312 (R.I. 1999)(applying <u>CPC International</u> to CGL policy that required an

occurrence resulting in property damage that becomes apparent during the policy period);

<u>Textron, Inc. v. Aetna Cas. and Sur. Co.</u>, 723 A.2d 1138, 1139 (R.I. 1999) (applying <u>CPC</u>

<u>International</u> because "it is undisputed that all policies at issue contain essentially the same

trigger-of-coverage language, which is similar to the language in <u>CPC International</u> . . . ."); <u>Avco</u>

<u>Corp. v. Aetna Cas. & Sur. Co.</u>, 679 A.2d 323, 328 (R.I. 1996)(applying <u>CPC International</u> to

CGL policy requiring occurrence to take place during policy period); <u>Ins. Co. of N. Am. v.</u>

Kayser-Roth Corp., No. C.A. PC 92-5248, 1999 WL 813661 at *27 (R.I. Super. July 29,

1999)(distinguishing CPC International because policy in question did not require that the

occurrence cause property damage during the policy period).

      Because CPC International has been so narrowly construed, its definition of "occurrence"

cannot be applied to the Travelers policy.  The Travelers policy promises to reimburse Plaintiffs

for "[d]irect loss of, and direct loss from damage to, Money, Securities and other property

resulting from Employee Theft," (Pls.' SMFND Ex. B at 1) language which defines at least this

portion of the policy as an employee fidelity policy.  Travelers itself names the policy a "first

party fidelity" policy.  (Travelers' Mem. Supp. Summ. J. 2.)  Employee fidelity policies are

defined by the coverage they provide, that is, indemnifying the insured for direct losses from

dishonest acts of its employees.  See, e.g., Oriental Fin. Group v. Fed. Ins. Co., 309 F. Supp. 2d

216 (D.P.R. 2004)(defining a fidelity bond as a contract whereby insurer agrees to indemnify

insured against a loss arising from employee dishonesty).  The policies cover injury to the

insured, not a third party, a fact which significantly differentiates them from liability policies,

which, as a rule, indemnify an insured against losses to a third party.  See, e.g., Vons Cos., Inc. v.

Fed. Ins. Co., 57 F. Supp. 2d 933, 943 n.12 (C.D. Cal. 1998)(finding that employee dishonesty

policies differ from liability policies in that they insure against loss to the insured from employee

dishonesty and that simply because word "liability" is in employee dishonesty policy does not

make it a liability policy).  In fact, it is a distinguishing mark of employee dishonesty policies

that they do not generally cover losses to third parties resulting from an employee's dishonest

acts.  See, e.g., Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc., 346 F.3d 259, 263 (1st

Cir. 2003)(listing cases).

As a policy which concerns itself with direct injury to the insured, the Travelers fidelity policy differs substantially from the CGL policies bound by the CPC International line of cases. Moreover, while Plaintiffs argue that mere usage of the word "occurs" allows them to import case law defining the word "occurrence," the word "occurrence" in the CGL context refers to a particular set of circumstances, often specifically defined in the insurance agreement, which cannot be directly translated to the fidelity bond context. See, e.g., Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 17 (1st Cir. 1982)("An 'occurrence' is defined as 'an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury.' . . . It is clear from this language that each occurrence is made up of two components, the exposure and the resulting bodily injury; and it is the resulting bodily injury, not the exposure, which must take place 'during the policy period.'"). Because the policy at issue here differs materially from the policy analyzed in CPC International, and does not use the language crucial to its construction, the Court finds that the definition of "occurrence" in that case does not apply here to the Travelers policy.

Without CPC International to define which losses are covered, the Court is left to the words of the Travelers policy themselves, and the way similar policies have been interpreted by other courts. The Travelers policy states "this Coverage Part applies to loss which occurs during the Policy Period. Loss is covered under this Coverage Part only if discovered no later than 120 days following termination or cancellation of the Insuring Agreement or termination of this Coverage Part as to an Insured . . ." Travelers argues that the "loss" referred to in this section "occurs at the time of the employee's dishonest act; not when the loss is discovered." (Travelers' Mem. Supp. Summ. J. 6.) Nothing in the language of this section strictly necessitates that

16

finding; however, courts have indeed interpreted loss in the fidelity bond context as "occurring"

at the time of the employee's fraud. "Under a fidelity crime bond, loss means the deprivation or

dispossession of money or property of the [insured] due to the dishonest, criminal or fraudulent

acts of the insured's employees." Fireman's Fund Ins. Co. v. Special Olympics Intern., Inc., 249

F. Supp. 2d 19, 27 (D. Mass. 2003)(citation omitted) aff'd on other grounds, 346 F.3d 259 (1st

Cir. 2003); See also, Fidelity Sav. and Loan Ass'n v. Republic Ins. Co. 513 F.2d 954, 956 (9th

Cir. 1975)(holding that loss within fidelity bond occurs at the time of the activity giving rise to

the claim against the insured).

      The Travelers coverage at issue here is therefore limited by the policy language to losses

caused by dishonest acts of employees which actually took place during the policy period and

which were discovered within 120 days of the end of the policy period. Because Plaintiffs'

employee's fraudulent acts were discovered during the policy period, Plaintiffs are certainly

within the discovery timing limit. Plaintiffs are also properly limited to recovering under this

coverage section only those sums embezzled between February 25, 2003 (the policy start date)

and March 12, 2004 (the policy end date). Those sums, Plaintiffs and Travelers agree, are well

below the $25,000 retention of the Travelers policy.

      Plaintiffs attempt to overcome these limiting provisions by appealing to the Loss

Sustained During Prior Insurance provision of the Travelers policy. In this section, Travelers

promises that

> If the Insured or a predecessor in interest sustained loss during the period of any
> prior insurance that it or the predecessor in interest could have recovered under
> that insurance except that the time within which to discover loss had expired, the
> Company will pay for it under this Coverage Part, provided:
>
>     a.       this Coverage Part became effective at the

                      time of cancellation or termination of the
                      prior insurance; and

b.       the loss would have been covered by this
                      Coverage Part had it been in effect when the
                      acts or events causing the loss were
                      committed or occurred.

(Travelers' SMFND ¶ 8.) To paraphrase this section, the loss Plaintiffs experienced during the period prior to February 25, 2003 (the Travelers policy start date) would be covered if all of the following were true:

1.    The loss was sustained during the period the St. Paul policies were in place; and
2.    The St. Paul policies in place would have covered the loss but the time to file a claim under those policies had expired; and
3.    The Travelers policy became effective at the time of the termination or cancellation of St. Paul policy 2; and
4.    The Travelers policy would have covered the loss if it had been in effect at the time of the embezzlement.

Of these four factors, only the first and fourth return answers in the affirmative. It is not clear to the Court that the time to file a claim under either St. Paul policy has expired; in fact, there has been no discussion as to what the time limits were for filing a claim under these policies.

Furthermore, with respect to the third factor, St. Paul policy 2 (effective October 20, 2002 to October 20, 2003) overlaps the Travelers policy (effective February 25, 2003 to March 12, 2004). This overlap means that the Travelers policy did not become effective at the time of termination or cancellation of St. Paul policy 2, as the third factor requires. Because the Travelers policy ran concurrently with St. Paul policy 2, and the language of this "Prior Insurance" provision clearly requires that the prior insurance terminate or cancel before the current policy becomes effective, Plaintiffs are not covered under the "Prior Insurance" provision.

      Plaintiffs contend that the St. Paul policy did in fact terminate at the time the Travelers

policy became effective because its coverage limit for employee dishonesty changed from $500,000 to $25,000 on February 10, 2003. (Pls.' Mem. Supp. Summ. J. 10.)  Plaintiffs support this argument with the assertion that St. Paul issued an endorsement and a return of premium in the amount of $23,616 on April 18, 2003 reducing the employee dishonesty benefit limit to $25,000, and citing as the policy's effective date February 10, 2003. (Pls.' SMFND ¶ 52; Pls.' SMFND Ex. C.)  However, as this Court has discussed above, the premium summary acknowledging the $25,000 employee dishonesty coverage signed by Michael Brozost, Erwin Pearl's Vice President and Legal Counsel, on March 6, 2003 operated as an acceptance of the new policy terms and rendered that coverage effective October 20, 2002.  Therefore, St. Paul policy 2 was in place from October 20, 2002 to October 20, 2003, and had a $25,000 employee dishonesty limit.

Even had the reduction in coverage occurred in February 2003, and not as part of the imposition of a new policy in October 2002, such a reduction would not amount to either a termination or a cancellation, as the third factor requires.  In the insurance policy context, a termination is defined as the expiration of the policy by lapse under its own terms, and a cancellation is defined as an ending of the policy prior to the expiration of the policy period by act of one of the parties to the agreement.  State Farm Mut. Auto Ins. Co. v. White, 563 F.2d 971, 974 n.2 (9th Cir. 1977).  Because the overlap indicates there was neither termination nor cancellation of the St. Paul policy at the time the Travelers policy commenced, Plaintiffs cannot avail themselves of the "Prior Insurance" clause in this case.

B.  The St. Paul Policies

In its response to Plaintiffs' notification of loss, St. Paul premised its coverage

determination on the applicability of the CPC International doctrine.  In its Memorandum of Law

in Support of its Cross-Motion for Summary Judgment, St. Paul argues that because Plaintiffs

adopt and advocate the law supporting St. Paul's determination, it is entitled to judgment as a

matter of law.  However, as the Court determined above, the rule of CPC International cannot be

applied to the St. Paul policies.  Both St. Paul policies include employee fidelity coverage,

labeled first as "Additional Coverage" and then as an "Additional Benefit," that essentially

promises to indemnify Plaintiffs for direct losses caused by employee theft in ways

fundamentally similar to the Travelers coverage.  While the employee dishonesty coverage in

these two policies is included as an "additional" benefit to a broader property policy, the nature

of the coverage promised by the fidelity bond portion of these broader policies does not change

for being "additional."  See 10A Lee R. Russ & Thomas F. Segalla Couch on Insurance § 148:1

(3d ed. 2005)("The concept of 'property insurance' now includes a broad spectrum of policies

and coverages applicable to just about any type of property that exists in the modern world.").  It

is the terms of the contract for insurance that determine the nature of the coverage, not the label

an insurance company attaches to the policy.  See, e.g., Am. Legion Dep't of Mo. Inc. v.

Hanover Ins. Co., 286 B.R. 729, 738-39 (E.D. Mo. 2002)("[T]he terms of the contract for

insurance at issue in this matter establish that it provides for fidelity insurance.").

As explained above, fidelity bonds such as these do not fit into the narrow parameters of

the CPC International holding.  While Plaintiffs do not contest St. Paul's coverage determination,

they ask that the Court deny without prejudice St. Paul's Motion for Summary Judgment,

20

reserving the issue of St. Paul's liability for another day.  St. Paul contends that without a dispute

of its interpretation of the policy, there is no justiciable controversy and the claims against them

should be dismissed as a matter of law.  However, because the Court has found that the <u>CPC

International</u> doctrine does not apply to the St. Paul policies, the question of whether or not there

is coverage under those policies remains open and has not been fully briefed by the parties.

Therefore, the claim against St. Paul is not ripe for summary judgment.


## IV.  Conclusion

Because the Travelers policy covers only those losses actually incurred during the policy

period, the <u>CPC International</u> doctrine does not apply to fidelity bonds such as the Travelers

policy, and the "Prior Insurance" clause does not independently allow for recovery here, the

Court finds that Travelers has no duty to indemnify Plaintiffs for losses incurred due to their

employee's embezzlement outside of those losses already accounted for by Travelers.  Therefore,

Travelers' Motion for Summary Judgment as to all counts of Plaintiffs' Complaint is

GRANTED.

As to St. Paul's Motion for Summary Judgment, the Court finds that the facts concerning

the extent of St. Paul's coverage in light of the inapplicability of the <u>CPC International</u> definition

of "occurrence" to St. Paul's policy remain to be fully developed.  Therefore, the Court DENIES

St. Paul's Motion for Summary Judgment.

Finally, for the reasons stated above, the Court DENIES Plaintiffs' Motion for Summary Judgment.


SO ORDERED.


Mary M. Lisi
United States District Judge
May   /  , 2006